**STATE OF HAWAI'I**, Plaintiff–Appellant, v. **EDWIN BONNELL, JR.**, Defendant–Appellee

No. 16031

(CASE NOS. LC9–11)

**STATE OF HAWAI'I**, Plaintiff–Appellant, v. **RUTH GONSALVES**, Defendant–Appellee

No. 16032

(CASE NOS. LC12–25 AND LC78)

**STATE OF HAWAI'I**, Plaintiff–Appellant, v. **RICHARD GROTHMAN**, Defendant–Appellee

No. 16033

(CASE NO. LC26)

**STATE OF HAWAI'I**, Plaintiff–Appellant, v. **LINCOLN MAIELUA**, Defendant–Appellee

No. 16034

(CASE NOS. LC27–51)

**STATE OF HAWAI'I**, Plaintiff–Appellant, v. **FRANK SYLVA, JR.**, Defendant–Appellee

No. 16035

(CASE NOS. LC52–59)

**STATE OF HAWAI'I**, Plaintiff–Appellant, v. **MICHAEL TAMASHIRO**, Defendant–Appellee

No. 16036

(CASE NOS. LC62–77)

AUGUST 17, 1993

MOON, C.J., KLEIN, LEVINSON, AND RAMIL, JJ.,
AND CIRCUIT COURT JUDGE SHIMABUKURO,
ASSIGNED BY REASON OF VACANCY

126

128

OPINION OF THE COURT BY LEVINSON, J.

The plaintiff–appellant State of Hawai'i (State) appeals from orders of the District Court of the Second Circuit, Lahaina Division, granting the defendants–appellees Edwin Bonnell, Jr., Ruth Gonsalves (Gonsalves), Richard Grothman, Lincoln Maielua (Maielua), Frank Sylva, Jr. (Sylva), and Michael Tamashiro's (collectively "the defendants") motions to suppress evidence obtained as a result of warrantless covert video surveillance — spanning a year in duration and conducted by the Maui Police Department (MPD) — of the defendants' "break room" located in their place of employment, the Lahaina Post Office. We affirm.

## I. BACKGROUND

The defendants are postal workers employed at the United States Post Office located in downtown Lahaina, on the Island of Maui. All were charged on November 22, 1991 with one or more counts of gambling (a misdemeanor) in violation of Hawai'i Revised Statutes (HRS) § 712–1223 (1985). Maielua was also charged with three counts of promoting gambling in the second degree (a misdemeanor) in violation of HRS § 712–1222 (Supp. 1992) and one count of possession of gambling records in the second degree (a misdemeanor) in violation of HRS § 712–1225 (1985).

The defendants' motions to suppress were heard by the district court on February 21, 1992. The State elicited testimony from three witnesses: United States Postal Inspectors Keith Silva (Inspector Silva) and Chuck Rader (Inspector Rader), and MPD Officer Benjamin Nu (Officer Nu). Inspector Silva testified that his supervisor in the United States Postal Service, Paul Smith (Smith), had received two anonymous letters alleging that gambling, involving Sylva and Maielua, was taking place in the downtown Lahaina post office (post office). Smith first brought the letters to Inspector Silva's attention in January 1990. By this time, Inspector Silva had heard similar rumors of gambling activity in the post office. Smith turned the letters over to MPD Sergeant Higgins.

Inspector Silva took no further action until October 1990 when, having been advised by Sergeant Higgins that the MPD was interested in pursuing the matter, he met with Higgins and several other officers of the MPD in order to plan an investigation. Inspector Silva decided for the first time in his four–and–a–half years as a postal inspector to utilize hidden video cameras as a means of conducting the covert surveillance. Inspector Silva, Inspector Rader, and members of the MPD inspected the post office to determine where to place the video cameras. No effort was made to obtain a search warrant authorizing the installation. From this point, Inspector Silva's only continuing involvement in the investigation was to assist periodically in changing the videotapes.

Inspector Rader testified that, in late October and early November 1990, he and "his" technicians installed the video system at the post office. The process consumed four days. Post office employees were falsely advised that the technicians were installing smoke detectors and a burglar alarm.

The surveillance system's hidden cameras were strictly visual; there was no audio component. A total of four cameras were installed. Two were placed in a position to record events at the public counter area. A third was placed in the ceiling of the supervisor's office. The final camera was placed inside a smoke detector in the break room and focused on the area of the break room table. Once installed, the cameras ran twenty–four hours a day for the duration of the investigation.

The data received from the four cameras was routed to a "switcher," which cycled among the images received from the cameras. The switcher was necessary because there was only one recorder for the surveillance system; the switcher enabled the operator to circumvent any particular camera transmission at any particular time. The switcher and recorder were concealed in a nondescript yellow box atop a vending machine outside the post office. A microwave transmitter broadcasted the cameras' images to a receiver unit as they cycled through the switcher. The transmitter was in constant operation and enabled the officers monitoring the receiver to observe the video images within a radius of one hundred feet of the post office.

Officer Nu testified that he was one of the two MPD police officers assigned to investigate the alleged gambling. Nu and the other officer monitored the video data being transmitted via a receiver and television screen located inside a van that was parked outside the post office. The two police officers recorded activity they deemed to be suspicious. For an entire year — November 13, 1990 through sometime in November 1991 — they conducted covert video surveillance five days a week (Mondays through Fridays) during regular work hours, from 7:00 or 7:30 a.m. until 4:30 or 5:00 p.m. Officer Nu

periodically replaced full videotapes with new ones at 2:00 or 3:00 in the morning in order to insure the secrecy of the operation. The MPD officers accumulated roughly fifty videotapes containing approximately twelve hundred hours of footage, of which the portions recorded during the regular working day (when the post office was lit) were visible. Officer Nu testified that only a minute fraction of the videotaped conduct reflected any gambling activity.

Following the completion of the State's case, the district court requested an offer of proof from defense counsel as to "what . . . your witnesses [are] going to tell us[.]" Among other things, defense counsel represented that each of the defendants would testify that, during the relevant period, he or she had an actual subjective expectation of privacy in the break room for the following reasons: (1) the break room was not a public place; rather, access was limited to post office employees and authorized visitors; (2) the break room was not visible to the public service area of the post office or from outside the building; (3) "activities" in the break room could not be "overheard" by persons not present; (4) there were no catwalks or galleries within the post office from which the break room could be observed; (5) none of the defendants had ever heard of video surveillance by the police being used as an investigative technique in the post office or anywhere else; (6) a person in the break room could observe anyone approaching and could avoid being inadvertently seen or overheard; (7) there was no provision in the employee manual or collective bargaining agreement addressing or authorizing the use of video surveillance; (8) the break room was used only for breaks from work and to store employees' personal belongings; and (9) the defendants did not believe that they were subject to police video surveillance in that location.

Defense counsel then called Gonsalves as a witness. Her testimony substantially tracked defense counsel's offer of proof. In addition, she testified that she considered the break room to be a private place and that only postal employees and invited guests were allowed to be there.

Upon the completion of Gonsalves's testimony, defense counsel inquired whether the district court would accept his offer of proof regarding the testimony of the other defendants. The record both indicates that the district court did so and that the deputy prosecuting attorney (DPA) did not object.

Defense counsel completed his case with the testimony of an elementary school special education assistant, a mechanic employed by the County of Maui, a Maui Fire Department captain, an account clerk employed by the State of Hawai'i, and the office manager of the Maui Medical Group. In substance, all of these "community members" testified that, because break rooms were the only locations in the workplace where employees could relax and discuss private matters, they would not expect to encounter covert police surveillance there.

After argument by counsel, the district court orally granted the defendants' motions to suppress. The district court entered written findings of fact (FOF), conclusions of law (COL), and orders granting the motions on March 24, 1992. The State filed timely notices of appeal, and we consolidated the appeals by order dated August 24, 1992.

On appeal, the State urges that the district court erred in (1) finding that the defendants held actual subjective expectations of privacy in the break room and concluding that the warrantless video surveillance constituted an illegal intrusion, (2) finding and concluding that the defendants' asserted expectations of privacy in the

break room were objectively reasonable, (3) suppressing the videotapes because, according to the State, the recorded observations were obtained by "proper third party consent," and (4) finding that the covert video surveillance was primarily a criminal investigation conducted by the MPD, as opposed to a "reasonable employer investigation of work–related misconduct by employees," and concluding that failure to obtain a search warrant necessitated suppression.

## II. DISCUSSION

The dispositive question presented in this appeal is whether the covert video surveillance of the employee break room of the post office constituted an illegal search within the meaning of the fourth amendment to the United States Constitution[1] and/or article I, section 7 of the Constitution of the State of Hawai'i.[2]

---

[1] The fourth amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV. Because we resolve the present appeal on state constitutional grounds, we need not (and do not) decide whether a federal constitutional violation has occurred.

[2] Article I, section 7 of the Constitution of the State of Hawai'i provides:

> The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches, seizures, *and invasions of privacy* shall not be violated; and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized *or the communications sought to be intercepted.*

Like the fourth amendment to the United States Constitution, article I, section 7 of the Hawai'i State Constitution protects people from unreasonable government intrusions into their legitimate expectations of privacy. *State v. Quino*, 74 Haw. 161, 177, 840 P.2d 358, 365 (1992) (Levinson, J., concurring), *cert. denied*, 113 S. Ct. 1849 (1993); *cf. State v. Clark*, 65 Haw. 488, 493, 654 P.2d 355, 359 (1982). "And, as 'the ultimate judicial tribunal in this state,' this court has final, unreviewable authority to interpret and enforce the Hawai'i Constitution." *Quino*, 74 Haw. at 177, 840 P.2d at 365 (Levinson, J., concurring).[3] " 'The basic purpose . . . [of these constitutional provisions] is to safeguard the privacy and security of individuals against arbitrary invasions by government officials.' *Camara v. Municipal Court*, 387 U.S. 523, 528[, 87 S. Ct. 1727, 1730, 18 L. Ed. 2d 930] (1967). The constitutional proscription . . . that the person and effects of individuals are considered to be sacrosanct and may not be the object of unreasonable searches . . . draws no distinction in its application between an individual suspected of criminal activity and one who is not." *Nakamoto v. Fasi*, 64 Haw. 17, 20, 635 P.2d 946, 950 (1981) (brackets in original). "Thus, article I, section 7 of the Hawai'i Constitution was 'designed to protect the individual from arbitrary, oppressive, and

---

HAW. CONST. art. I, § 7 (emphasis added). The words "invasions of privacy" were added to article I, section 7 by the 1968 Constitutional Convention. *State v. Roy*, 54 Haw. 513, 518, 510 P.2d 1066, 1069 (1973) (Levinson, J., concurring). The Convention's Standing Committee Report No. 55 explained in relevant part that "[t]he proposed amendment [was] intended to include *protection against indiscriminate wire-tapping* . . . ." *Id.* (emphasis added).

[3] *See also* the cases cited in *Quino*, 74 Haw. at 177–78 n.2, 840 P.2d at 365–66 n.2 (Levinson, J., concurring).

harassing conduct on the part of government officials.' *Fasi*, 64 Haw. at 23, 635 P.2d at 952." *Quino*, 74 Haw. at 178, 840 P.2d at 366 (Levinson, J., concurring).

It is well settled that an area in which an individual has a reasonable expectation of privacy is protected by article I, section 7 of the Hawai'i Constitution and cannot be searched without a warrant. *State v. Biggar*, 68 Haw. 404, 407, 716 P.2d 493, 495 (1986) (citing, *inter alia*, *Katz v. United States*, 389 U.S. 347, 88 S. Ct. 507, 19 L. Ed. 576 (1967)). That being the case, "[a]ny warrantless search of a constitutionally protected area is . . . presumptively unreasonable unless there is both probable cause and a legally recognized exception to the warrant requirement." *Id.* (citations omitted); *see also State v. Wiley*, 69 Haw. 589, 591, 752 P.2d 102, 103 (1988); *State v. Fields*, 67 Haw. 268, 281, 686 P.2d 1379, 1389 (1984); *State v. Russo*, 67 Haw. 126, 137, 681 P.2d 553, 561 (1984); *Clark*, 65 Haw. at 493–94, 654 P.2d at 359–60 (1982).[4]

" '[A] search is not . . . made legal by what it turns up. In law it is good or bad when it starts and does not change character from its success.' " *State v. Phillips*, 67 Haw. 535, 541, 696 P.2d 346, 351 (1985) (quoting *United States v. Di Re*, 332 U.S. 581, 595, 68 S. Ct. 222, 229, 92 L. Ed. 210 (1948)). Moreover, "no amount of probable cause can justify a warrantless search or seizure absent 'exigent circumstances' " or some other recognized exception to the

---

[4] In this connection, we ruled in *State v. Ward*, 62 Haw. 509, 511, 617 P.2d 568, 570 (1980), that an anonymous telephone tip received by the police that a gambling operation was in operation in a particular apartment, without more, was insufficient to support a finding of probable cause to conduct a search.

warrant requirement. *State v. Kapoi*, 64 Haw. 130, 141, 637 P.2d 1105, 1114 (1981) (citations omitted).

Given the deliberation with which the videotape surveillance was undertaken and its yearlong duration, there were obviously no special or exigent circumstances that would have justified a warrantless search in this case; it can hardly be said that the MPD was faced with any sort of "emergency." *Cf. United States v. Torres*, 751 F.2d 875, 880 (7th Cir. 1984), *cert. denied*, 470 U.S. 1087, 105 S. Ct. 1853, 85 L. Ed. 2d 150 (1985). It therefore follows that if the warrantless and covert video surveillance of the employee break room was a search in the constitutional sense, then the videotapes and any other evidence obtained as a result thereof are tainted by the surveillance and must be suppressed as "fruits of the poisonous tree." *See, e.g., Biggar*, 68 Haw. at 409, 716 P.2d at 496.[5]

---

[5] Although we are not required in this appeal to delineate the "requirements for video surveillance that define more specifically . . . the probable cause and particularity requirements" of article I, section 7 of the Hawai'i Constitution in order to support the issuance of a search warrant, we nevertheless emphasize that

> [t]he showing of necessity needed to justify the use of video surveillance is higher than the showing needed to justify other search and seizure methods, including bugging. The use of a video camera is an extraordinarily intrusive method of searching. . . . Because of the invasive nature of video surveillance, the government's showing of necessity must be very high to justify its use.

*United States v. Mesa–Rincon*, 911 F.2d 1433, 1442–43 (10th Cir. 1990); *see also Torres*, 751 F.2d at 882 ("The usual way in which judges interpreting the Fourth Amendment take account of the fact that searches vary in the degree to which they invade personal privacy is by requiring a higher degree of probable cause . . . *and by being more insistent that a warrant be obtained if at all feasible, the more intrusive the search is*." (Citations omitted and emphasis added)).

## A. The Defendants Had a Reasonable Expectation of Privacy Regarding Activities of Employees in the Break Room.

This Court has adopted the following two–part test, borrowed from the concurring opinion of Justice Harlan in *Katz*, 389 U.S. at 361, 88 S. Ct. at 516, to determine when a person's expectation of privacy may be deemed reasonable: "First, one must exhibit an actual, subjective expectation of privacy. Second, that expectation must be one that society would recognize as objectively reasonable." *Biggar*, 68 Haw. at 407, 716 P.2d at 495; *see also State v. Barnett*, 68 Haw. 32, 36–37, 703 P.2d 680, 684 (1985); *State v. Texeira*, 62 Haw. 44, 48, 609 P.2d 131, 134–35 (1980); *State v. Kaaheena*, 59 Haw. 23, 27–28, 575 P.2d 462, 466 (1978). Accordingly, we must ascertain whether the record before us supports the district court's findings and conclusion that the defendants had such reasonable expectations with respect to their activities in the post office break room.

### 1. The defendants exhibited an actual subjective expectation of privacy.

Regarding the first prong of the two–part test, the State challenges the district court's FOF No. 13, in which it found that "[t]he [d]efendants demonstrated subjective expectations that they would not be covertly viewed and videotaped by government agents in their employee breakroom . . . and that their activities in that area would remain private." The State argues that

> the existence of an actual subjective expectation is . . . not to be presumed in the absence of some affirmative evidence . . . . Here, the only defendant to testify was . . . Gonsalves. She asserted her own personal expectations of

> privacy . . . . Accordingly, the [district] court
> had *no* evidence upon which to base a factual find-
> ing as to actual expectations of privacy on the part
> of [the other defendants] . . . .

Opening brief in No. 16031 at 12 (emphasis in original). We believe that the State's argument is without merit.

As noted above, the district court expressly requested that defense counsel make an offer of proof as to "what your witnesses [are] going to tell us?" Defense counsel complied by proffering a detailed list of factual matters, which, if believed, would definitively establish the defendants' actual subjective expectations of privacy regarding the break room and as to which each of the defendants would testify. He then validated his offer of proof through Gonsalves's testimony, at the conclusion of which he renewed his offer — to which the State did not object and which the record confirms that the district court accepted. As a direct result, defense counsel did not adduce any testimony from the other defendants, all of whom were present at the hearing, but rather moved on to other witnesses.

In effect, defense counsel's renewed proffer amounted to an offer to enter into an oral stipulation[6] regarding the cumulative testimony of the remaining defendants, which, through the DPA's silence, the State accepted. Pursuant to Hawai'i Rules of Evidence (HRE) 611(a) (1981), which provides in relevant part that "[t]he court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as

---

[6] *See* Rule 19(a) (Sept. 1980) of the Rules of the District Courts of the State of Hawai'i, which provides in relevant part that *"[u]nless made in open court*, all stipulations shall be in writing . . . ." (Emphasis added.)

to . . . (2) avoid needless consumption of time," the district court clearly had the discretion to allow such a stipulation.

It has long been the rule in this jurisdiction that

> [t]he object of a stipulation . . . is to avoid the necessity of bringing other evidence to establish the facts stipulated as true and to avoid the necessity of calling certain witnesses who it is stipulated if called would testify to certain facts. Both the facts stipulated to be true and those which it is stipulated certain witnesses would swear to if called are fully before the court as evidence when the stipulation is [entered].

*Kaluhiwa v. Miguel*, 25 Haw. 246, 250 (1919). Moreover, "when an oral [stipulation] has been established . . . and it has been relied upon to the prejudice of the party asserting it . . . the adverse party will not be permitted to gain an advantage by reason of the [stipulation] not having been in writing." *Kaui v. County of Kauai*, 47 Haw. 271, 277, 386 P.2d 880, 884 (1963) (citations omitted). Inasmuch as the "stipulated" testimony was properly before the district court, the DPA's complete failure to object to it in the course of the February 21, 1992 hearing constitutes a waiver of the point on appeal. HRE 103(a)(1) (1981); *see also State v. Samuel*, 74 Haw. 141, 147, 838 P.2d 1374, 1378 (1992); *Larsen v. Pacesetter Systems, Inc.*, 74 Haw. 1, 46, 837 P.2d 1273, 1295 (1992); *State v. Naeole*, 62 Haw. 563, 570–71, 617 P.2d 820, 826 (1980).

Significantly, the State does not argue on appeal that *Gonsalves's* testimony fails to establish *her* actual subjective expectation of privacy and freedom from covert, governmental video surveillance in the employee break room.

On the record before us and in the face of that testimony, combined with defense counsel's unchallenged offer of proof regarding the like testimony of the other defendants, we hold that FOF 13 was not clearly erroneous. *See State v. Batson*, 73 Haw. 236, 245–46, 831 P.2d 924, 930 (1992).

2.  **The defendants' expectation of privacy is one that society would recognize as objectively reasonable.**

Regarding the second prong of the two–part test, the State challenges FOF Nos. 16 and 17 and COL No. 8, in which the district court found and concluded that the defendants' actual, subjective expectations of privacy were reasonably held. The State contends that "[t]here can be no reasonable expectation of privacy in a place, activity or object which a defendant exposes to open view." Opening brief in No. 16031 at 12. The State further urges "in summary" that "the openness and non–exclusivity of the breakroom area and the openness with which the gambling activities were conducted precluded any reasonable expectation of privacy from surveillance, personal or remote, open or covert." *Id.* at 24. We disagree.

Whether an actual, subjective expectation of privacy is one that society would recognize as objectively reasonable is a question of law, and the issue is therefore reviewed *de novo* on appeal. *United States v. Taketa*, 923 F.2d 665, 669 (9th Cir. 1991) (citation omitted). Although this court has not expressly labeled the pertinent standard of review in the past, we have effectively applied the "right/wrong" test. *See, e.g., State v. Jensen*, 69 Haw. 534, 536–37, 750 P.2d 932, 933 (1988); *Barnett*, 68 Haw. at 37–38, 703 P.2d at 684; *State v. Dias*, 52 Haw. 100, 106–07, 470 P.2d 510, 514 (1970).

"[A] person has a 'halo' of privacy wherever he goes and can invoke a protectable right to privacy wherever he may legitimately be and reasonably expect freedom from governmental intrusion." *State v. Matias*, 51 Haw. 62, 65–66, 451 P.2d 257, 259 (1969). Accordingly,

> the test is . . . one of reasonable expectations of privacy. Every individual has expectations of privacy with regard to his *person* wherever he may go, be it a public park or a private place; yet this is not so with regard to *places* where an individual happens to be. The place must be of such a character as to give rise reasonably to these expectations of privacy.

*Dias*, 52 Haw. at 106–07, 470 P.2d at 514 (emphasis in original). In assessing the reasonableness of an expectation of privacy, we consider, *inter alia*, "the nature of the area involved, the precautions taken to insure privacy," *Barnett*, 68 Haw. at 37, 703 P.2d at 684, and the "type and character of [the] governmental invasion" employed. *Jensen*, 69 Haw. at 536, 750 P.2d at 933 (citation omitted).

A person may have a subjective expectation of privacy that is objectively reasonable in some area of his or her workplace. *Taketa*, 923 F.2d at 672. Such an expectation is not defeated merely because the area is accessible to others. *Id.* at 673. This is precisely because what a person " 'seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.' " *Kaaheena*, 59 Haw. at 26, 575 P.2d at 465 (quoting *Katz*, 389 U.S. at 351–52, 88 S. Ct. at 511).

> Privacy does not require solitude. . . . [E]ven "private" business offices are often subject to the legitimate visits of coworkers, supervisors, and

the public, without defeating the expectation of privacy unless the office is "so open to fellow employees or the public that no expectation of privacy is reasonable."

*Taketa*, 923 F.2d at 672 (citation omitted). In the present case, the employee break room was neither a public place nor subject to public view or hearing. Only postal employees and invited guests were allowed in it. Accordingly, the defendants were in a position to regulate their conduct as a function of present company. Moreover, when seated in the break room, the defendants could see anyone approaching and could avoid being surprised by an untrusted intruder.

It is true that "we have held that where the object observed by the police is in 'open view,' it 'is not subject to any reasonable expectation of privacy and the observation is not within the scope of the constitution.'" *Kapoi*, 64 Haw. at 140, 637 P.2d at 1113 (quoting *Kaaheena*, 59 Haw. at 29, 575 P.2d at 467) (footnote and other citations omitted). However, the State's reliance on the "open view" doctrine is misplaced. "In the 'open view' situation, . . . the observation takes place from a non–intrusive vantage point. The governmental agent is either on the outside looking outside or on the outside looking inside [at] that which is knowingly exposed to the public." *Kaaheena*, 59 Haw. at 28–29, 575 P.2d at 466–67 (citation and footnote omitted). By contrast, the video surveillance at issue in this appeal involved the yearlong observations, from the "inside looking inside," of a smoke detector–obscured "seeing eye" video camera occupying a grossly intrusive vantage point and targeting activity that by no stretch of the imagination can be regarded as having been knowingly exposed to the public. *Cf. Biggar, supra* (defendant had reasonable expectation of privacy inside

closed toilet stall which was violated by warrantless surveillance of police detective perched on toilet in adjoining stall and peering over partition); *Kaaheena, supra* (where defendants engaging in gambling activities drew curtains and closed venetian blinds covering window, they enjoyed reasonable expectation of privacy free from governmental intrusion even if there was one–inch hole in drapes and blinds where hole was high enough off ground so that no one could look through window; thus, where police officers climbed on crates to look through aperture, observations constituted unreasonable search).[7]

We now address the "type and character of [the] governmental invasion" — video surveillance — leveled against the defendants in the present case. *See Jensen*, 69 Haw. at 536, 750 P.2d at 933. "To measure the government's intrusion we must consider the expectations of society." *United States v. Cuevas–Sanchez*, 821 F.2d 248, 251 (5th Cir. 1987). We agree with the United States Court of Appeals for the Fifth Circuit that "[t]his type of surveillance provokes an immediate negative visceral reaction: indiscriminate video surveillance raises the spectre of the Orwellian state." *Id.* (footnote omitted).

---

[7] Neither would the "plain view" doctrine benefit the State in this appeal.

> In the "plain view" situation "the view takes place *after* an intrusion into activities or areas as to which there is a reasonable expectation of privacy." . . . The officer has already intruded, and, if his intrusion is justified, the objects in plain view, sighted inadvertently, will be admissible.

*Kaaheena*, 59 Haw. at 28, 575 P.2d at 466 (citations omitted) (emphasis in original). Officer Nu and his companion MPD officer had certainly intruded into activities or areas as to which the defendants had a reasonable expectation of privacy, but the intrusion was not justified and their prolonged "sightings" were deliberate rather than inadvertent.

"[T]elevision surveillance in criminal investigations" is indeed "reminiscent of the 'telescreens' by which 'Big Brother' in George Orwell's *1984* maintained visual surveillance of the entire population of 'Oceania,' the miserable country depicted in that anti–utopian novel . . . ." *Torres*, 751 F.2d at 877. And we likewise believe it to be "unarguable that television surveillance is exceedingly intrusive . . . and inherently indiscriminate, and that it could be grossly abused — to eliminate personal privacy as understood in modern Western nations." *Id.* at 882.[8]

Accordingly, based on the "totality of the circumstances" present in the record before us, we hold that the defendants had an objectively "reasonable privacy expectation that [they] would not be videotaped by government agents" in the employee break room. *See Taketa*, 923 F.2d at 677. Our holding is grounded in the same factors as those considered by the *Taketa* court:

> First, the video search was directed straight at [the defendants], rather than being a search of property [they] did not own or control. Second, [the defendants were] of course present during

---

[8] Television surveillance is identical *in its indiscriminate character* to wiretapping and bugging. It is even more invasive of privacy, just as a strip search is more invasive than a pat–down search, but it is not more indiscriminate: the microphone is as "dumb" as the television camera; both devices pick up anything within their electronic reach, however irrelevant to the investigation.

*Torres*, 751 F.2d at 885 (emphasis in original). In this connection, we noted in *State v. Lo*, 66 Haw. 653, 659–61, 675 P.2d 754, 757–60 (1983), that the legislative history underlying Hawai'i's Electronic Eavesdropping Law, HRS §§ 803–41 to 803–50 (1985 and Supp. 1992), compelled the conclusion that the statute condemned the surreptitious installation of electronic *viewing* devices in a "private place."

> the video search in question . . . . Third, the
> silent, unblinking lens of the camera was
> intrusive in a way that no temporary search of
> the office could have been.

*Id.* Whatever the general privacy interest the defendants may or may not have had in the break room, they had an actual and objectively reasonable "expectation of privacy against being videotaped in it." *Id.* at 676.[9]

## B. The Recorded Videotaped Observations of the Defendants Were Not Obtained by Proper "Third Party Consent."

The State advances the alternative argument on appeal that even if the defendants pass the *Katz / Kaaheena* "reasonable expectation of privacy" test, any need for a search warrant was obviated by Inspector Silva's consent to the installation of the video surveillance system. Specifically, the State suggests that "the videotaping and the active monitoring by the police of the breakroom was consented to" by Silva. Opening brief in No. 16031 at 15. Even a cursory reference to this court's existing decisions reveals that the State's argument is without merit.

"The government may conduct a search which violates [article I, section 7] if the person searched consents." *State v. Merjil*, 65 Haw. 601, 605, 655 P.2d 864, 868 (1982) (citations omitted). "Consent" in the constitutional

---

[9] Persons may create temporary zones of privacy within which they may not reasonably be videotaped, . . . even when that zone is [in] a place they do not own or normally control, and in which they might not be able reasonably to challenge a search at some other time or by some other means.

*Taketa*, 923 F.2d at 677 (citation omitted).

sense means more than the absence of an objection on the part of the person to be searched; it must be shown that such consent was freely and voluntarily given. *Russo*, 67 Haw. at 137, 681 P.2d at 562 (citations omitted); *Merjil*, 65 Haw. at 605, 655 P.2d at 868; *State v. Patterson*, 58 Haw. 462, 467–68, 571 P.2d 745, 748–49 (1977).

On the other hand, as we have noted, "[e]very individual has expectations of privacy with regard to his *person* wherever he may go, be it a public park or a private place . . . ." *Dias*, 52 Haw. at 106, 470 P.2d at 514 (police officer conducted warrantless surveillance, through use of binoculars and from vantage point of men's rest room in public park, of defendant and others who were conversing on privately used property in passageway between two houses located on other side of intersection; defendant's location held to be place as to which defendant had reasonable expectation of privacy regarding his person; accordingly, in absence of exigent circumstances, warrantless surveillance of defendant's person deemed an unreasonable search) (emphasis in original). And we agree with the *Taketa* court that covert videotape surveillance implicates the privacy interests of individuals in their *persons, see Taketa*, 923 F.2d at 677, precisely because such surveillance (1) constitutes "a continuous search of anyone who enter[s] the camera's field of vision" and (2) is "directed straight at [them], rather than being a search of property [they do] not own or control," thereby rendering them "the object[s] observed by the surveillance." *Id.* at 675, 677.

We have never held that an employer may "consent" to the search of an employee's person,[10] and we reject such a

---

[10] *State v. Mahone*, 67 Haw. 644, 701 P.2d 171 (1985), on which the State relies, merely ruled that "[a] third person can effectively consent to a search of a defendant's *premises or effects* if that third person has

notion as utterly repugnant to the constitutional right against unreasonable searches, seizures, and invasions of privacy codified in article I, section 7. The *Taketa* court reached the same result when the government contended

> that Agent Catale, as the head of the DEA in Las Vegas, was able to consent to the [video] search on behalf of the [defendants]. This argument is meritless; allowing such employer "consent" would destroy the expectations of privacy in the workplace we have recognized as valid.

*Taketa*, 923 F.2d at 673 (citation omitted).

We hold that the videotaped observations of the defendants were not obtained by proper third party consent.

### C. The Covert Video Surveillance of the Defendants Was Conducted Pursuant to a Criminal Investigation and Not Work–Related Misconduct by Employees.

The State's final argument on appeal is that the covert video surveillance operation "was a joint operation of the police and postal inspectors, the former concerned with state gambling violations and the latter with employer investigation of work–related employee misconduct." Opening brief in No. 16031 at 16. From this premise the

---

'access to the area searched, and either common authority over it, a substantial interest in it, or permission to exercise that access . . . .' " *Id.* at 647, 701 P.2d at 174 (emphasis added and citations omitted). *Mahone* therefore does not authorize an employer to give third party consent to the search of an employee's person.

State makes the leap of logic that the district court therefore erred in suppressing the fruits of the operation. We cannot accept the State's strained position.

However the record in this appeal is massaged, the fact remains that the MPD approached Inspector Silva to solicit his "cooperation" in investigating suspected criminal violations of state law. On a daily and yearlong basis, two MPD officers monitored and recorded the data transmitted by the hidden video cameras. The actions of the MPD resulted in criminal prosecutions by the Maui Prosecutor's Office. We are not dealing here with a federal administrative appeal.

> [T]he video surveillance was not an investigation of work–related employee misconduct.... It was, rather, a search for evidence of criminal conduct.
>
> . . . .
>
> ... The [government] cannot cloak itself in its public employer robes in order to avoid the probable cause requirement when it is acquiring evidence for a criminal prosecution.

*Taketa*, 923 F.2d at 675.

We hold that the district court was not clearly erroneous in finding that the MPD conducted a criminal investigation. *See Batson*, 73 Haw. at 245–46, 831 P.2d at 93.

### III. CONCLUSION

Because (1) the defendants had actual, subjective expectations of privacy that society would recognize as objectively reasonable that they would not be the objects of covert video surveillance in the employee break room, (2) the recorded observations of the activities in the break

room were not obtained by "third party consent," and (3) the same recorded observations were the product of a criminal investigation, we affirm the district court's findings of fact, conclusions of law, and suppression orders.

On the briefs:

*Larry L. Butrick*, Prosecuting Attorney, and *James T. Carter*, Deputy Prosecuting Attorney, for plaintiff–appellant State of Hawai'i.

*Philip H. Lowenthal* and *Michael M. McPherson* (Lowenthal, August & Graham) for defendants–appellees Edwin Bonnell, Jr., Ruth Gonsalves, Richard Grothman, Lincoln Maielua, Frank Sylva, Jr., and Michael Tamashiro.