**Lindalee COWLES, Appellant,**

v.

**STATE of Alaska, Appellee.**

No. A–6381.

Court of Appeals of Alaska.

July 31, 1998.

---

Colleen A. Kosluchar, Assistant Public Defender, Fairbanks, and Barbara K. Brink, Public Defender, Anchorage, for Appellant.

Kenneth M. Rosenstein, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before COATS, C.J., and
MANNHEIMER and STEWART, JJ.

*OPINION*

COATS, Chief Judge.

Lindalee Cowles was convicted, following a jury trial, of theft in the second degree, a class C felony. AS 11.46.130(a). Superior Court Judge Ralph R. Beistline sentenced Cowles to serve eighteen months of incarceration with twelve months suspended. Judge Beistline placed Cowles on probation for a period of five years. Judge Beistline ordered Cowles to pay restitution of $8,750.83. Cowles appeals her conviction and the order of restitution to this court. We affirm the conviction, but vacate the restitution order and remand for reconsideration of the amount of the restitution.

From October 1993 until April 1995, Lindalee Cowles was the department secretary and the manager of the box office of the Theater Department at the Fairbanks campus of the University of Alaska (UAF). Tickets to theatrical events were sold at this office; patrons paid for the tickets by cash, by check or by credit card. Money received from these ticket sales was periodically deposited at the UAF Business Office.

In March 1995, the university's Business Office and Audit Department became concerned because it appeared that the box office was no longer bringing cash to the Business Office. On March 21, 1995, the university performed an audit of the department and found that cash had stopped being deposited in November 1993, approximately the same time Cowles had started making

the theater box office deposits. Cash deposits started up again after the audit, but the auditor concluded that these had been "forced" by the audit.

The audit showed that, although student workers primarily sold the theater tickets, Cowles took responsibility for all of the reconciliations and deposits; furthermore, these deposits were turned in to the Business Office so late that there was "lots of opportunity for manipulation." The auditor sent the results of his audit to UAF counsel on March 30, 1995, concluding that Cowles was likely the person responsible for the shortage of cash deposits.

Additionally, the university received a report in April 1995, from a student worker who was a box office employee, that Cowles was taking money from the box office receipts for her personal use. The student worker was also concerned because she had seen cash coming in from theater shows which she knew was not being deposited.

In April 1995, UAF officials requested that the UAF Police Department start an investigation. Chief Florian directed Officer Brown to conduct the investigation. On April 20, 1995, Officer Brown installed a video camera in the ceiling over Cowles' desk. On April 22, through the use of a master key, Officer Brown entered Cowles' office and recorded the serial numbers of the money in the safe. The camera was activated on April 24, 1995, and was used to record Cowles' activities at her desk, on and off, for about two and a half hours. Officer Brown testified that he activated the camera at that time because it was a Monday morning, after weekend shows, and he wanted to see if Cowles made a deposit. During this time, Officer Brown was in the ceiling outside of Cowles' office monitoring the recording. The camera recorded Cowles removing a money bag from the safe, altering a cash deposit receipt, taking cash from the money bag and placing it in her desk drawer on three occasions, covering the cash in the drawer with papers, moving the cash from the drawer to her purse and combining it with her own money.

After viewing this activity, Officer Brown went to the district attorney's office. On the afternoon of April 24, 1995, he obtained search warrants authorizing him to search Cowles' purse and her office. Officer Brown and Chief Florian returned to the theater box office, told Cowles that they had search warrants for her office and purse, and advised her to accompany an officer to the UAF Police Department. Cowles became upset and asked if she was under arrest; Chief Florian told her that she was not and that he would explain it at the office, if she had any questions. The search subsequently revealed that serial numbers on bills found in Cowles' purse matched those on the bills that had been in the safe.

Cowles was transported to the police department by police car, because she was on crutches and could not walk there. According to Cowles' testimony, she was held there, under guard, for 20–25 minutes before being interrogated. According to Florian's and Brown's testimony, Cowles was never restrained in any fashion, or precluded from leaving the building. During that time, Cowles asked if she could make a phone call and was told she could; she called her boss and told him why she was not in the office. When Chief Florian returned to the station, she was invited back to his office for questioning.

During questioning, Cowles was emotional and upset and told Florian that she was not aware of any money being missing. Cowles asked whether she needed an attorney, and Florian responded that he could not advise her on that matter. During this time, Cowles informed Florian that she had $50.00 of theater department cash in her purse that she was using to make change. About 20–25 minutes later, Officer Brown arrived back at the station and the two questioned Cowles for approximately another 30–45 minutes. After being confronted with the evidence from the videotape, Cowles admitted taking some of the money that was allegedly missing, saying she was having problems paying bills. She admitted taking $240.00 from the theater department proceeds and depositing it into her parents' bank account. She also admitted she had taken money from the theater department deposits before, but had paid it back. She estimated she might have taken a total of $1,000.00 during her employ-

ment there. Cowles testified that at the end of her interrogation she was escorted back to her office. She was allowed to collect her personal belongings and leave.

At trial Cowles asserted that her statements to the police were coerced and that she made the statements in an attempt to keep her job. She argued that the university records did not establish that any money was missing. She contended that, to the extent she had taken any money, she had borrowed it intending to pay it back, and therefore had not committed theft. At the conclusion of the trial the jury convicted Cowles on the theft charge.

■■■ Cowles first contends that Judge Beistline erred in denying her motion to suppress, which was based upon her claim that the warrantless video tape surveillance of her at her work was an illegal search. Cowles relies on Article I, § 14 and Article I, § 22 of the Alaska Constitution. The Alaska Supreme Court has adopted a two-prong test for construing the scope of Article I § 14 and Article I § 22 of the Alaska Constitution.[1] We set out this test in State v. Page, 911 P.2d 513, 515–16 (Alaska App.1996):

> Under these sections of the state constitution, a person is protected from unreasonable government intrusion whenever (1) the person manifests a subjective expectation of privacy in the property or activity being subjected to government scrutiny, and (2) this expectation of privacy is one that society recognizes as reasonable.

The first prong of this test (a person's subjective expectation of privacy) presents a question of fact. However, the second prong (the reasonableness of any expectation of privacy) presents a legal question. The answer to this second prong of the test rests on constitutional intent and, ultimately, on a judgement concerning the proper balance to be struck between the rights of the individual and the authority society exercises over individuals through the agency of government.

(Citations omitted.)

In Page, the defendant was videotaped by police shortly before and during the delivery of cocaine to an undercover officer. Page moved to suppress the videotaped evidence under State v. Glass, 583 P.2d 872 (Alaska 1978). In Glass, the Alaska Supreme Court held that the police could not surreptitiously record conversations without first obtaining a warrant. Page contended that the reasoning of Glass prohibited video taping his actions without first obtaining a warrant. The state conceded that Page's conversations were protected from warrantless electronic monitoring by Glass. Page, 911 P.2d at 515. However, the state argued that the visual record on the video tapes was admissible. Id. at 516. We concluded that Page did not have a reasonable expectation of privacy with respect to the observation of his conduct in public places. However, we concluded that Page did have a reasonable expectation of privacy as to his conduct within a private apartment. We stated:

> Page was engaged in a conversation which, the State concedes, was protected from warrantless monitoring under Glass. This conversation took place in a private apartment, a location where Page could reasonably expect that his activities would not be observed by anyone except those onlookers whose presence he was aware of. We hold that, in these circumstances, the Alaska Constitution as interpreted by the supreme court in Glass requires the police to secure a warrant before engaging in surreptitious videotaping of conversation. It makes no difference that the police turn down the audio recording level on their equipment.

Id. at 517.

Judge Beistline found that "Ms. Cowles harbored a subjective belief that her actions

---

1. Article I, Sections 14 and 22 provide as follows:

   SECTION 14. Searches and Seizures. The right of the people to be secure in their persons, houses and other property, papers, and effects, against unreasonable searches and seizures, shall not be violated. No warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

   SECTION 22. Right of Privacy. The right of the people to privacy is recognized and shall not be infringed. The legislature shall implement this section.

in the box office the morning of May 29, 1995, would be private and thus not subject to electronic monitoring." The state does not contest this finding. Therefore, this case turns on whether Cowles' "expectation of privacy is one that society recognizes as reasonable." *Id.* at 515. Applying the *Page* analysis to this case, we must determine whether Cowles' work place in the theater box office was a location where Cowles could reasonably expect privacy in her activities.

The theater box office is located inside of the Great Hall, a common area that connects the theater with various other departments in the UAF Fine Arts Complex. The box office is small, measuring approximately 12 by 18–20 feet, with a large window in the front, from which the office sold tickets to the public, and a door on the side, which was usually kept open.[2] The window was a "roll-up" window that opened and closed. Aside from Cowles' desk, the office was equipped with a student desk, computers, a safe, and file cabinets. Officer Brown testified that, from the window, the public could view Cowles' desk, portions of the top of her desk, her computer, and Cowles sitting behind her desk.

Because the office had cement walls, Officer Brown set up the video equipment through the vent system, in the office's ceiling. Officer Brown also testified that any member of the public could see everything in the camera's range if they walked around from the box office door to the window. In finding that Cowles could not reasonably expect that her activities would be private, Judge Beistline made the following findings:

> Ms. Cowles' activities on the day in question could have been readily observed in great detail by any member of the public who happened to visit the office or ticket window. This fact weighs heavily against a finding that society would be prepared to recognize her privacy expectation as reasonable. Another factor which suggests that any subjective expectation of privacy by Ms. Cowles is objectively unreasonable is the presence of numerous co-workers and visitors during the surveillance in question. In this regard the Court notes that in viewing the videotape, it is clear that Ms. Cowles' desk appears to have been quite busy. The tape reveals an almost continuous flow of traffic about her desk. Ms. Cowles is seen conversing with various people at different locations in relation to her desk. At one point someone brings her a sandwich, at another point a hand appears and Ms. Cowles can be clearly seen thrusting a large wad of cash into its outstretched palm. Another instance which the Court found particularly telling was a point in the tape when Cowles retrieves the cash from her desk and begins counting and sorting the bills. During the period when she is obviously handling a large amount of cash (at least some of which originated from the locked bank bag containing the receipts of the weekend performances), a person appears to her left and starts a lengthy conversation. The fact that person could appear and observe Ms. Cowles' desk precisely at the time when presumably her privacy interest is most heightened serves to seriously undermine the privacy right now asserted by Ms. Cowles. Even if that person were a co-worker, Ms. Cowles' privacy assertion was seriously undermined by the fact that she's sorting the University's money taken from her desk, right under the nose of another person. Under these circumstances the Court cannot find that the second prong of the test is met.

Although we are to uphold Judge Beistline's factual findings unless they are clearly erroneous, we must determine *de novo,* based upon the facts which he found, whether to uphold his finding that Cowles' expectation of privacy was not one that society would recognize as reasonable. *See Page,* 911 P.2d at 515. We conclude that Judge Beistline did not err in making this determination.

In *United States v. Cuevas–Sanchez,* 821 F.2d 248, 251 (5th Cir.1987), the court stated that video "surveillance provokes an immediate negative visceral reaction: indiscriminate video surveillance raises the spectre of the Orwellian state." In *United States v. Torres,*

2. The door was equipped with a built-in combination lock, changed once or twice per semester; however, Officer Brown testified that the door was kept open for ventilation purposes.

751 F.2d 875, 882 (7th Cir.1984), the court stated: "television surveillance is exceedingly intrusive ... and inherently indiscriminate, and ... could be grossly abused—to eliminate personal privacy as understood in modern Western nations." *See also State v. Bonnell,* 75 Haw. 124, 856 P.2d 1265, 1277 (1993); *State v. Thomas,* 642 N.E.2d 240, 245 (Ind. App.1994).

But, several factors lead us to the conclusion that Cowles' constitutional rights were not infringed in this case. Cowles was videotaped in a place where, accordingly to Judge Beistline's findings, her activities "could have been readily observed in great detail by any member of the public who happened to visit the office or ticket window." In addition, her activities were open to view by fellow employees. Judge Beistline observed that there was "an almost continuous flow of traffic about her desk." We therefore believe that the open and public nature of the place where Cowles worked argues against finding that she had a reasonable expectation of privacy. *See G.R. v. State,* 638 P.2d 191, 197 (Alaska App.1981).

A second basis for finding that the videotaping was reasonable is that Cowles worked in a fiduciary capacity in an office where members of the public exchanged money for tickets. Money belonging to the university was regularly handled in the office, and was stored in a safe to which Cowles had access. Video surveillance is commonly conducted in stores and commercial offices where money is exchanged, such as areas in banks where tellers work. Thus, the nature of the work performed in Cowles' office argues against finding that she had a reasonable expectation of privacy.

Based upon the open and public nature of the place where Cowles worked, and the fiduciary nature of the work she was doing, we conclude that Cowles did not have a reasonable expectation of privacy from video surveillance in the box office. We accordingly conclude that the police actions did not violate Article I § 14 of the Alaska Constitution.[3]

■ Cowles next contends that Judge Beistline erred in failing to suppress the statements which she made to the police when she was questioned at the UAF Police Department. Cowles points out that the police never gave her *Miranda* warnings and contends that because she was subject to custodial interrogation the trial court should have suppressed her statements.

■ In *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court established safeguards to protect against the danger of coercion inherent in custodial surroundings. "In order for a person's *Miranda* rights to be triggered, the statements must be the product of both custody and interrogation." *Beagel v. State,* 813 P.2d 699, 705 (Alaska App.1991).

In *Hunter v. State,* 590 P.2d 888 (Alaska 1979), the Alaska Supreme Court adopted an objective test for determining when a person is in custody for purposes of *Miranda:* if a reasonable person in the suspect's position would not have felt free to leave and break off police questioning, then the defendant was in custody. *Id.* at 895; *see also Edwards v. State,* 842 P.2d 1281, 1284–85 (Alaska App.1992) (finding defendant's *Miranda* rights violated when police conditioned his freedom to leave the police station on his willingness to answer questions). The *Hunter* decision provides general guidelines for making the custody determination:

> At least three groups of facts would be relevant to this determination. The first are those facts intrinsic to the interrogation: when and where it occurred, how long it lasted, how many police were present, what the officers and the defendant said and did, the presence of actual physical restraint on the defendant or things equivalent to actual restraint such as drawn weapons or a guard stationed at the door, and whether the defendant was being questioned as a suspect or as a witness. Facts pertaining to events before the interrogation are also relevant, especially how

**3.** In *Anchorage v. Ray,* 854 P.2d 740, 750 (Alaska App.1993), we recognized that "the right to privacy granted by Article I § 22 does not create a separate independent right to seek exclusion of evidence."

the defendant got to the place of questioning—whether he came completely on his own, in response to a police request, or escorted by police officers. Finally, what happened after the interrogation—whether the defendant left freely, was detained or arrested—may assist the court in determining whether the defendant, as a reasonable person, would have felt free to break off the questioning.

*Id.* at 895 (footnotes omitted).

The trial court concluded that Cowles was not in custody during her interview:

Here the interrogation took place at the University police station over the course of approximately two hours with one and then two officers present. The officers indicated that Ms. Cowles was caught on [video] tape and wanted to hear her side of the story. There is no doubt she was being interviewed as a suspect, and there is no doubt she left on her own free will and was not arrested. Cowles was escorted to the police station in a police car; however, this fact has little weight when one understands that Ms. Cowles was injured at the time and required the assistance of a crutch or cane to move around. When Ms. Cowles determined to terminate the interview and leave, she accepted a ride to her car in a police vehicle.... [T]he fact that Cowles was interviewed at the police station appears to have been motivated by convenience to both parties rather than being an attempt to further a custodial purpose.... Reviewing the tape in this case convinces the Court that ... a reasonable person in Lindalee Cowles' position would have felt free to leave or cut off police questioning.

Our review of the record convinces us that Judge Beistline did not err in determining that a reasonable person in Cowles' position "would have felt free to break off the questioning." *See Hunter,* 590 P.2d at 895. Judge Beistline found that the officers took Cowles to the police station for the conve-

nience of both Cowles and the police. At the beginning of the interview, the police assured Cowles that she was not under arrest. Our review of the tape leads us to the same conclusion which Judge Beistline reached: Cowles was not in police custody. As Judge Beistline pointed out, at the end of the questioning, Cowles told the police that she needed to go. It appears that she fully expected to go home as soon as she asked and the police quickly terminated the interview in response to her request. We conclude that Judge Beistline did not err in denying Cowles' motion to suppress her statements.[4]

■ Cowles contends that Judge Beistline erred in limiting testimony of two defense witnesses. Cowles intended to present testimony from Linda Aronow–Brown regarding the change-making practices of both the Theater Department box office and the Fairbanks Light Opera Theater. In an offer of proof, Aronow–Brown testified that she had worked as a secretary assisting the box office manager of the UAF Speech and Drama Department and that she had worked as a box office manager for the Fairbanks Light Opera Theater. According to Aronow–Brown, in both theater box offices, the box office manager would make change by taking big bills out of the till and putting them in a pocket or purse until change could be gotten from the UAF Business Office or a bank.

The state objected to Aronow–Brown's testimony on relevancy grounds, but the trial court ruled that Cowles could present the testimony. However, after Aronow–Brown testified regarding the change-making practices of the UAF Theater Department and as she began testifying about the change-making practices of the Fairbanks Light Opera Theater, the state reasserted its objection, and the trial court cut off further questioning on the practices.

Cowles points out that since she was videotaped putting box office cash in her purse, testimony that would provide a reason for the cash to be there would be relevant.

4. Cowles argues that Judge Beistline erred in failing to dismiss the indictment and in failing to suppress evidence which resulted from the video tape surveillance and her statements. We affirm these rulings based upon our conclusion that

Judge Beistline did not err in refusing to grant Cowles' motion to suppress the video tape evidence and her motion to suppress her statements.

However, Aronow–Brown was allowed to testify to the change-making procedure at the UAF Theater Department. We conclude Judge Beistline did not abuse his discretion in refusing to allow Cowles to have Aronow–Brown testify about the change-making procedures at the Fairbanks Light Opera Theater. Judge Beistline could properly determine that this testimony would have little or no relevance. *See* Alaska Evidence Rules 402, 403.

■ Cowles argues that Judge Beistline erred in refusing to allow her to present testimony from Marie Scholle, who had worked in UAF's Risk Management Department and had been a campus police officer, about various break-ins that had occurred in the offices in the Great Hall, where the Theater Department box office was located, during the time that cash was reportedly missing from the Theater Department box office.[5] After hearing Scholle's proposed testimony, Judge Beistline concluded that there was no connection between the thefts about which Scholle would testify and the embezzlement that occurred in the Theater Department box office. We conclude that Judge Beistline did not err in making this decision. *See Smithart v. State*, 946 P.2d 1264, 1275–79 (Alaska App.1997) (holding evidence of potential guilt by third party must be directly related to crime charged against defendant).

■ Cowles contends that Judge Beistline erred in calculating the amount of restitution which he ordered her to pay to the University of Alaska. In *Noffsinger v. State*, 850 P.2d 647, 650 (Alaska App.1993), we discussed the standard of review for an award of restitution:

> An award of restitution must be supported by substantial evidence. If uncertainty exists, the appropriate amount for restitution must be proved by a preponderance of the evidence. When the accused, on appeal, challenges the sufficiency of the evidence as to restitution, this court does not pass on issues of credibility, which remain with-

in the sole province of the sentencing court. Instead, as in other situations involving claims of insufficient evidence, we construe the record in the light most favorable to the state and determine whether a reasonable fact-finder could conclude that the disputed amount of restitution was established by a preponderance of the evidence.

(Citations omitted).

At Cowles' sentencing hearing, the court considered the testimony of Ben Shilling, the university's acting director of internal audits. Cowles presented the testimony of Rockne Wilson, a certified public accountant. Shilling's testimony summarized a report he had prepared that analyzed the theater box office's revenues before, during, and after Cowles' tenure and that computed the total deposits for the fiscal years 1993, 1994, 1995, and 1996, and then broke those total deposits down into the portions comprised of cash, checks, and credit card charges. Shilling also calculated the totals based on the period when Cowles was serving as the sole box office manager and the period outside of her tenure as sole box office manager. Shilling calculated that during the 1993–1996 time frame when Cowles was not the box office manager, approximately 25% of the total deposits made by the box office were in the form of cash; however, when Cowles was the manager, during 1993–1995, only 7% of the total deposits were in the form of cash. Based on Shilling's calculations, the state requested restitution in the amount of $12,000.

Shilling's analysis was based upon the assumption that Cowles had tampered with the records of ticket sales on the box office computer system and/or had substituted checks written to the UAF Theater Department, for something other than tickets, for cash. He concluded that a simple balancing of ticket sales against cash receipts would not accurately reflect the cash shortage.

---

5. We note Aronow–Brown was previously allowed to testify that thefts had occurred in the UAF Communications Department office, located adjacent to the Theater Department box office, during this same time. Therefore, some of the evidence Cowles was seeking to present to the jury through Scholle's testimony had already been presented through the testimony of Aronow–Brown.

Rockne Wilson, the accountant who testified on Cowles' behalf, testified that Shilling's report was based on the unproven assumption that the ticket sales information in the computer had been manipulated; and, since he did not agree with that assumption, he concluded that the audit reports failed to show that any cash was missing from the UAF Theater Department box office.

Judge Beistline accepted Shilling's basic calculations, but he reduced the expected percentage of cash deposits from 25% to 20%, thus figuring that 20% of the total deposits during Cowles' tenure as the sole box office manager should have been cash. Judge Beistline's calculations can be set out as follows:

|  | Fiscal Year 94 | Fiscal Year 95 | Total |
|---|---|---|---|
| Total deposits | $35,499.99 | $32,279.28 | |
| Expected cash (20% of total) | 7,099.99 | 6,455.85 | |
| Actual cash deposited | 2,635.50 | 2,169.50 | |
| Estimate of missing cash | $ 4,464.49 | $ 4,286.35 | $ 8,750.84 |

---

From our review of the record, we conclude that Judge Beistline could properly rely on Shilling's estimates to determine the proper amount of restitution. In *Noffsinger,* 850 P.2d at 649–50, we upheld a restitution award which was based upon a similar well-grounded expert estimate.

■■■ In her brief, Cowles points out that the indictment in her case charged her with committing theft from September 1, 1994, through April 23, 1995. This time period corresponds with fiscal year 1995 in Shilling's calculations and in the court's findings. Cowles argues that there was no basis to require her to pay restitution for fiscal year 1994, a time period which was not covered by the dates specified in the indictment. The state has not replied to Cowles' contention. Judge Beistline did not address this issue in his findings and we have no basis to resolve this issue on appeal at this time. We accordingly remand this issue to the trial court for reconsideration.

■■■ Cowles next contends that Judge Beistline erred in denying her motion for a new trial. Following sentencing, Cowles alleged that evidence presented by the state at the sentencing hearing was newly discovered evidence which warranted a new trial. In order to show she was entitled to a new trial based on newly discovered evidence, Cowles

needed to establish that: (1) the evidence relied upon was actually discovered after the trial; (2) she was diligent; (3) the evidence relied on was not merely cumulative or impeaching; (4) the evidence relied on was material; and (5) the evidence relied on would probably result in an acquittal at a new trial. *See State v. McDonald,* 872 P.2d 627, 656 (Alaska App.1994).

Cowles' motion was based on the testimony of Ben Shilling, the university's acting director of internal audits, who testified about the audit which he performed for UAF to estimate the amount of money Cowles had stolen. Cowles pointed to the fact that Shilling's data at sentencing showed that the amount of reported ticket sales was only $799 more than the amount which was deposited for ticket sales, while at trial, Shilling had testified that accounting documents showed $5,000 missing. However, as Shilling stated at the sentencing hearing, the state's calculations and conclusions, regarding the amount of money missing, did not rest simply on the comparison between ticket sales and deposits, but on the assumption that Cowles had manipulated the underlying records and on an analysis of the percentage of the total box office deposits that should have been cash. As the state points out, even if the $799 figure accurately reflected the amount

of money which Cowles stole, Cowles would still be guilty of theft in the second degree, which covers thefts of property valued at $500 or more. *See* AS 11.46.130(a). We therefore conclude that Judge Beistline did not abuse his discretion in determining that the evidence which Cowles offered was not so exculpatory that it would probably result in an acquittal at a new trial.

The conviction is AFFIRMED. The case is REMANDED for reconsideration of the amount of restitution. And, having decided the issues in this appeal that are within our jurisdiction, we now REFER the sentencing portion of Cowles' case that is outside our jurisdiction to the supreme court under Alaska Appellate Rule 215(k).