**Lindalee COWLES, Petitioner,**

v.

**STATE of Alaska, Respondent.**

No. S–8831.

Supreme Court of Alaska.

June 8, 2001.

Rehearing Denied July 16, 2001.

Robert John, Law Office of Robert John, Fairbanks, for Petitioner.

Kenneth M. Rosenstein, Assistant Attorney General, Anchorage, Bruce M. Botelho, Attorney General, Juneau, for Respondent.

Before MATTHEWS, Chief Justice, EASTAUGH, FABE, BRYNER, and CARPENETI, Justices.

### OPINION

MATTHEWS, Chief Justice.

## I. INTRODUCTION

After receiving information that University of Alaska box office manager Lindalee Cowles was stealing cash from ticket sales, the University police, without obtaining a warrant, installed a hidden video camera which recorded her in the act of theft. The question in this case is whether the videotape was obtained in violation of Cowles's constitutional rights and therefore should have been suppressed. We answer in the negative.

## II. FACTS AND PROCEEDINGS

Cowles was convicted of theft in the second degree for stealing cash from the University box office. At trial and before the court of appeals, she contended that the videotape showing her taking money from the University cash bag and transferring it first to her desk and then to her purse should be suppressed because it was the product of an unlawful search. The superior court rejected her argument, as did the court of appeals.[1]

The underlying facts are fully set out in the opinion of the court of appeals. For our purposes it is important to note the following. The videotaping was requested by University officials who had received a report from a co-employee that Cowles was taking cash from ticket receipts. An audit had verified that there were substantial cash shortages. No warrant was obtained. The covert video surveillance took place over the course of two and a half hours during a busy Monday morning in the University box office, a twenty-by-twelve foot room which was occupied by Cowles. The room has one other work station for a co-employee but it is unclear on the record before us whether a co-employee was situated at the other work station during the taping. The video camera was hidden in a ceiling vent, pointed at Cowles's desk. The desk was visible to members of the public through the ticket window and through the open office door and to co-workers and visitors to the office. The tape shows what the trial judge described as "an almost continuous flow of traffic about [Cowles's] desk." No sound recording was made.

## III. DISCUSSION

Cowles contends that the videotaping violated her right to be free from unreasonable searches guaranteed by Article I, Section 14 of the Alaska Constitution and the Fourth Amendment to the United States Constitution and her right to privacy guaranteed by Article I, Section 22 of the Alaska Constitution.

 The United States and Alaska Constitutions prohibit not only unreasonable physical searches, but also unreasonable technological searches.[2] Thus placing a hidden video camera in a house in order to record activities there without a warrant is prohibited just as is a warrantless entry to search for evidence. But not all technological monitoring of places or individuals is regarded as a search for constitutional purposes. Photographing a person as she walks in a public park does not raise constitutional concerns.[3] But photographing a person in an enclosed public restroom stall is a search.[4]

 The general test used to determine whether particular technological monitoring is a search is the expectation of privacy test. Under this test courts ask: "(1) did the person harbor an actual (subjective) expectation of privacy, and, if so, (2) is that expectation one that society is prepared to recognize as reasonable?"[5]

---

1. See *Cowles v. State*, 961 P.2d 438 (Alaska App. 1998).

2. See *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (attaching listening and recording device to outside of public telephone booth which intercepted telephone calls held to be unreasonable search prohibited by Fourth Amendment to United States Constitution); *State v. Glass*, 583 P.2d 872 (Alaska 1978) (audio recording of conversations involving sale of illegal drugs with consent of buyer held to violate seller's state constitutional right to privacy).

3. 1 Wayne R. LaFave, *Search and Seizure* § 2.7(f), at 659 (3d ed. 1996) (" '[C]overt visual surveillance' of a person while he moves about in public is not subject to fourth amendment restraints.").

4. 1 LaFave, *supra*, § 2.4(c), at 543.

5. *City & Borough of Juneau v. Quinto*, 684 P.2d 127, 129 (Alaska 1984) (decided under Article I, Section 22). *Quinto* made it clear that our earlier *Glass* decision did not bar per se all covert participant recording of conversations. Instead, the question in each case is "whether [defendant's] expectation of privacy [under the] circumstances is one which society is willing to recognize as reasonable. *Glass* requires nothing more." *Quinto*, 684 P.2d at 129. The test under the United States Constitution is similar: "*Katz* posits a two-part inquiry: first, has the individual manifested a subjective expectation of privacy in the object of the challenged search? Second, is society willing to recognize that expectation as reasonable?" *California v. Ciraolo*, 476 U.S. 207, 211, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986).

In the present case Cowles obviously did not believe that her activities were being monitored by a video camera from above. Based on this, the State does not take issue with Cowles's assertion that she had an actual expectation of privacy and thus meets the first part of the test.[6] We will focus therefore on the second part of the test, namely whether Cowles's expectation of privacy was, from a societal perspective, a reasonable one.

 This question, in turn, entails "a value judgment ... whether, if the particular form of surveillance practiced by the police is permitted to go unregulated by constitutional restraints, the amount of privacy and freedom remaining to citizens would be diminished to a compass inconsistent with the aims of a free and open society."[7] The utility of the challenged police conduct must be considered in making this judgment. Whether an expectation of privacy is justified "must ... be answered by assessing the nature of a particular practice and the likely extent of its impact on the individual's sense of security balanced against the utility of the conduct as a technique of law enforcement."[8]

 We believe that the court of appeals correctly identified the public nature of Cowles's office as the critical factor in answering this question. Cowles's desk could be seen by members of the public through the ticket window and the open door, and by her fellow employees who were walking around the office almost continuously during the videotaping.[9] Activities that are open to public observation are not generally protected by the Fourth Amendment.[10] "What a person knowingly exposes to the public, even in his own home or office, is not a subject of fourth amendment protection."[11]

In *O'Connor v. Ortega*, the United States Supreme Court ruled that a physician at a state hospital had a reasonable expectation of privacy as to the contents of his private office in the hospital.[12] But the Court was careful to note that the same expectation would not necessarily apply to all government offices,

---

6. Although all of Cowles's acts were open to view from the ticket window and open door and by the co-employees who were almost continuously in the office, what is needed under the first prong of the expectation of privacy analysis is an inquiry into the *degree*—rather than the fact (or the mere possibility)—of public exposure. *See* 1 LaFave, *supra*, § 2.1(d), at 389 n. 86. Even if Cowles had expected no privacy from customers or co-workers at ground-level, she could still have had an expectation that her privacy would not be invaded by an "intruding eye from a concealed vantage point" above her. *See State v. McDaniel*, 44 Ohio App.2d 163, 337 N.E.2d 173, 177 (1975). Similarly, although Cowles may have had no general expectation of privacy in her office, she could still have had an "expectation of privacy against being videotaped in it." *See United States v. Taketa*, 923 F.2d 665, 676 (9th Cir.1991). The superior court's factual finding that "Ms. Cowles harbored a subjective belief that her actions in the box office ... would be private and thus not subject to electronic monitoring," *Cowles*, 961 P.2d at 442–43, is thus not clearly erroneous.

7. 1 LaFave, *supra*, § 2.1(d), at 393 (quoting Amsterdam, *Perspectives on the Fourth Amendment*, 58 Minn. L.Rev. 349, 403 (1974)).

8. *United States v. White*, 401 U.S. 745, 787, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971) (Harlan, J., dissenting); *see* 1 LaFave, *supra*, § 2.1(d), at 391–92; *see also American Bar Association Standards for Criminal Justice Electronic Surveillance* (3d ed.) Section B: Technologically Assisted Physical Surveillance, Standard 2–9.1(c) (noting that among the factors relevant to regulating the use of surveillance are (i) law enforcement interests, (ii) the extent to which the surveillance technique invades privacy, (iii) the extent to which the surveillance diminishes or enhances the exercise of First Amendment freedoms and related values, and (iv) the extent to which the surveillance technique is less intrusive than other available effective and efficient alternatives).

9. The court of appeals stated:

Cowles was videotaped in a place where, according to Judge Beistline's findings, her activities "could have been readily observed in great detail by any member of the public who happened to visit the office or ticket window." In addition, her activities were open to view by fellow employees. Judge Beistline observed that there was "an almost continuous flow of traffic about her desk." We therefore believe that the open and public nature of the place where Cowles worked argues against finding that she had a reasonable expectation of privacy.

*Cowles*, 961 P.2d at 444.

10. *See Bond v. United States*, 529 U.S. 334, 336, 120 S.Ct. 1462, 146 L.Ed.2d 365 (2000).

11. *Katz*, 389 U.S. at 351, 88 S.Ct. 507.

12. 480 U.S. 709, 718, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987).

for "some government offices may be so open to fellow employees or the public that no expectation of privacy is reasonable."[13] The evidence in this case shows that the University box office at the time of the videotaping was so open to fellow employees and to the view of members of the public as to fall within this description.[14]

 Given the clear view of Cowles's desk by members of the public and University employees, we do not believe that the fact that the video camera was hidden in a ceiling vent rather than at an eye-level vantage point is of dispositive importance. Just as a person can have a reasonable expectation of privacy from surveillance by one particular *means* (but not another), she can have a reasonable expectation of privacy from surveillance from one particular *vantage point* (but not another).[15] Having closed the door of a glass phone booth, the defendant in *Katz* had a reasonable expectation that he could not be overheard even though he had no reasonable expectation that he could not still be seen.[16] Similarly, a person engaging in illicit conduct in a doorless restroom stall may have a reasonable expectation that she will not be observed from a hidden vantage point above her, even though it would have been unreasonable for her to expect that she would not be seen through the doorless open-

ing.[17] Where incriminating conduct occurs in a public area, however, participants in that conduct already risk observation, and so have "no constitutional right . . . to demand that such observation be made only by some person of whose presence they [are] aware."[18] Cowles's activities were observable through the open ticket window and the office door and by co-employees circulating through the office.[19] The fact that the video camera may have been in an especially good position from which to view Cowles's acts of transferring money from the University money pouch to her desk and thence to her purse is not sufficient to create a reasonable expectation of privacy in an open and public setting where no such expectation could reasonably exist.[20]

 Nor does the fact that the videotape surveillance was conducted for the purpose of recording illicit conduct violate Cowles's reasonable expectation of privacy. In her two-stage transfer of money from the University money pouch to her purse, Cowles appears to have relied less on an expectation of privacy than on a belief that those who observed her actions did so without suspecting wrongdoing on her part. Members of the public and Cowles's co-employees did not watch Cowles with the purpose of ferreting

---

13. *Id.* at 718, 107 S.Ct. 1492 (Plurality opinion of Justice O'Connor). A fifth member of the Court, Justice Scalia, concurred in the result of Justice O'Connor's opinion, and agreed that an office would not be " 'a subject of Fourth Amendment protection' " in "such unusual situations as that in which the office is subject to unrestricted public access, so that it is 'exposed to the public'." *Id.* at 731, 107 S.Ct. 1492, Scalia, J., concurring (quoting *Katz*, 389 U.S. at 351, 88 S.Ct. 507).

14. *Compare Vega–Rodriguez v. Puerto Rico Telephone Co.*, 110 F.3d 174, 180 (1st Cir.1997) ("It is simply implausible to suggest that society would recognize as reasonable an employee's expectation of privacy against being viewed while toiling in the Center's open and undifferentiated work area. PRTC did not provide the work station for the appellants' exclusive use, and its physical layout belies any expectation of privacy. Security operators do not occupy private offices or cubicles. They toil instead in a vast, undivided space—a work area so patulous as to render a broadcast expectation of privacy unreasonable.").

15. *See* 1 LaFave, *supra*, § 2.4(c), at 545.

16. *See Katz*, 389 U.S. at 352, 88 S.Ct. 507 ("[W]hat [Katz] sought to exclude when he entered the booth was not the intruding eye-it was the uninvited ear. He did not shed his right to do so simply because he made his calls from a place where he might be seen.").

17. *See People v. Triggs*, 8 Cal.3d 884, 106 Cal. Rptr. 408, 506 P.2d 232, 238 n. 7 (1973).

18. *State v. Jarrell*, 24 N.C.App. 610, 211 S.E.2d 837 (1975).

19. The door was around a corner from the window. The investigating officer testified that from the two vantage points any member of the public could see everything shown by the camera. *See Cowles*, 961 P.2d at 443.

20. There is also evidence that videotaping Cowles from above was not needlessly intrusive, as the ticket office's cement walls prevented the police from positioning a camera at eye-level. *See Cowles*, 961 P.2d at 443.

out misconduct, while that was, of course, the reason for the hidden camera. If a person's activities are open to view by the public, however, the fact that they are actually observed for the purpose of detecting misconduct does not affect the results of a Fourth Amendment analysis.[21] Because Cowles's theft could have been seen from a vantage point generally used by the public, Cowles had no reasonable expectation of privacy from surveillance directed at detecting her malfeasance.[22]

▮▮▮▮▮ We also agree with the court of appeals that the fact that Cowles was entrusted with handling her employer's cash is a relevant factor bearing on the reasonableness of Cowles's expectation of privacy. When an individual enters into an employment situation with high security requirements, it becomes less reasonable for her to assume that her conduct on the job will be treated as private.[23] As the court of appeals stated:

A second basis for finding that the video taping was reasonable is that Cowles worked in a fiduciary capacity in an office where members of the public exchanged money for tickets. Money belonging to the University was regularly handled in the office, and was stored in a safe to which Cowles had access. Video surveillance is commonly conducted in stores and commercial offices where money is exchanged, such as areas in banks where

tellers work. Thus, the nature of the work performed in Cowles's office argues against finding that she had a reasonable expectation of privacy." [24]

Cowles relies on three cases in which covert video monitoring of activities in the work place was held to violate constitutional rights. The cases are *United States v. Taketa*,[25] *State v. Bonnell*,[26] and *State v. Thomas*.[27] We believe that only *Thomas* supports her position that the covert monitoring in the present case was constitutionally forbidden, and we disagree with the reasoning of the *Thomas* court. By contrast, *Taketa* and *Bonnell* are not only distinguishable but suggest that the surveillance that took place here was permissible.

In *Taketa*, a covert video camera was placed in the ceiling of a private office reserved for defendant O'Brien's use. The Ninth Circuit found that both O'Brien and his co-defendant, Taketa, had a reasonable expectation of privacy in the office. As to O'Brien, the court noted: "We find a privacy interest in an office reserved for one's exclusive use at a place of employment to be reasonable, especially when asserted against a forcible entry after work hours." [28] In reaching this conclusion the court acknowledged that even the private office of a government worker would not be protected by a reasonable expectation of privacy if the office were "so open to fellow employees or the

---

21. *See California v. Ciraolo*, 476 U.S. 207, 213–14 n. 2, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986); *see also Florida v. Riley*, 488 U.S. 445, 453, 109 S.Ct. 693, 102 L.Ed.2d 835 (O'Connor, J., concurring in judgment) (if person's activities can be observed from vantage point generally used by public, that person cannot reasonably expect privacy from observation of police).

22. Not only *could* Cowles's theft be seen from a public vantage point, but at least one of her co-workers *had* seen cash coming in from theater shows which she knew was not being deposited, and had reported Cowles to the University for taking money from the receipts for her personal use. *See Cowles*, 961 P.2d at 441. The trial court found that the "almost continuous flow of traffic [co-workers and visitors] about her desk," particularly when she was handling cash in the process of embezzling it, "seriously undermined" "Cowles'[s] privacy assertions." We agree with this conclusion, as did the court of appeals. *See id.* at 443, 444.

23. *See National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 671, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989) ("[I]t is plain that certain forms of public employment may diminish privacy expectations even with respect to ... personal searches. Employees of the United States Mint, for example, should expect to be subject to certain routine personal searches when they leave the workplace every day."); 3 LaFave, *supra*, § 8.6(d), at 823 n. 86.

24. *Cowles*, 961 P.2d at 444.

25. 923 F.2d 665 (9th Cir.1991).

26. 75 Haw. 124, 856 P.2d 1265 (1993).

27. 642 N.E.2d 240 (Ind.App.1994).

28. 923 F.2d at 673.

public that no expectation of privacy is reasonable."[29] But the court noted that the office in question was not open to the public and that only three people had regular access to it.[30] Further, each of the three was named as a co-conspirator in the criminal conduct charged.[31]

The Ninth Circuit also found Taketa to have a reasonable expectation of privacy in O'Brien's office. Taketa was the special agent in charge of the Drug Enforcement Agency suite in which O'Brien's office was located. In finding that Taketa had a reasonable expectation of privacy when he was videotaped in O'Brien's office, the court first acknowledged the general rule, "Videotaping of suspects in public places, such as banks, does not violate the Fourth Amendment; the police may record what they normally may view with a naked eye."[32] But the court found that the general rule did not apply both because of the private nature of the place[33] where the videotaping took place and the time when it occurred.[34]

By contrast, the University box office was not a private office, but a place from which tickets were sold to the public. It was not for Cowles's exclusive use. It was open to the public at the time of the videotaping. Moreover, numerous University employees, who were in no sense co-conspirators of Cowles, had regular access to it.

State v. Bonnell is also materially distinguishable.[35] The covert video surveillance there was a video camera hidden in a smoke detector in the break room of a post office. The police had received reports that gambling activity was taking place. The covert video surveillance lasted for a full year.

In holding that the surveillance tape should not have been admitted, the Supreme Court of Hawaii concluded that the defendants had an objectively reasonable expectation of privacy with respect to their activities in the break room. In so concluding the court noted that the

> break room was neither a public place nor subject to public view or hearing. Only postal employees and invited guests were allowed in it. Accordingly, the defendants were in a position to regulate their conduct as a function of present company. Moreover, when seated in the break room, the defendants could see anyone approaching and could avoid being surprised by an untrusted intruder.[36]

Again, this contrasts significantly with the University box office in the present case. The box office was open to public view and was regularly visited by co-employees whom Cowles could not trust not to report any misconduct they might observe.

The third case on which Cowles relies is State v. Thomas.[37] The defendant in that case ran a store in a state park under a concession agreement which required him to pay ten percent of gross receipts to the state. Suspecting that the defendant was not using the cash register for all transactions, park officials focused a hidden video camera on the cash register during business hours for four days. The videotape showed incriminating conduct on the defendant's part. The Indiana Court of Appeals upheld the suppression of the tape on the grounds that the defendant had a reasonable expectation of privacy with respect to his activities that were recorded, even though these activities were "openly exposed to members of the public who used the state-owned camp

---

29. Id. at 673 (quoting O'Connor, 480 U.S. at 717–18, 107 S.Ct. 1492).

30. Id. at 673.

31. Id. at 668, 669 n. 2.

32. Id. at 677.

33. See id. ("As noted before, the office was not open to the public. Taketa also exercised a certain dominion and control over the premises, at the time of his entry....").

34. See id. (Taketa was videotaped on a Sunday "at a time when other people would not normally be present.").

35. 75 Haw. 124, 856 P.2d 1265 (1993).

36. Id. at 1276.

37. 642 N.E.2d 240 (Ind.App.1994).

store." [38]

The State argues that *Thomas* is distinguishable on a number of grounds. The defendant was a licensee, not a public employee; under his license agreement he had a possessory right to the store superior to that of the state; and he was actually handling his own money in contrast to Cowles who was entrusted with handling University money. But we do not believe that these differences are necessarily critical. The important point in *Thomas*, as here, is that the videotaped transactions were open and visible to members of the public. But while we disagree with the State that *Thomas* is materially distinguishable from the present case, we do not believe that it was correctly decided. Instead, we agree with the view of the dissenting judge in *Thomas* that, because the transactions in question were openly exposed to members of the public, society should not regard as reasonable any expectation on the part of the defendant that the transactions were private:

> The camera videotaped commercial transactions which members of the public consummated on public land inside a public building. The transactions, by their nature, were public and not private.... "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection...." [39]

In summary, we agree with the conclusion of the court of appeals that the covertly recorded videotape of Cowles's activities in the University box office was properly admitted into evidence. For largely the same reasons as those expressed by the court of appeals, we agree with the value judgment that Cowles did not have an expectation of privacy at the time and place in question that society should recognize as reasonable. The covert video monitoring that took place was not, in our judgment, inconsistent with the

values of our free society. But this conclusion would not necessarily be the same if the monitoring had not been initiated for a legitimate purpose—the detection of theft—and had not been based on reasonable grounds to believe that Cowles was stealing. Lacking a legitimate purpose, or reasonable cause, the utility of the monitoring would be diminished and a different balance might be struck.

## IV. CONCLUSION

For the reasons stated, the decision of the court of appeals is AFFIRMED.

FABE, Justice, with whom BRYNER, Justice, joins, dissenting.

According to the court's decision today, the government may use hidden cameras to monitor workers without obtaining a search warrant, so long as the workers do not have private offices. This decision permits deeply intrusive police surveillance of individuals who have—and deserve—every reasonable expectation of privacy. Although the Alaska Constitution's search and seizure protection is "broader in scope than that guaranteed in the federal Constitution," [1] the court's decision defines Alaskans' constitutional protections more narrowly than has any decision of the United States Supreme Court. In so doing, it disregards ample state and federal precedent supporting the conclusions that workers should expect privacy from surreptitious police surveillance regardless of the nature of their work space; that police violate reasonable expectations of privacy by engaging in more intrusive searches than a defendant would expect from a member of the public; and that secret overhead video observation is a uniquely intrusive mode of search, thus requiring a warrant. The court also fails to support its unprecedented assertion that a defendant who works with cash has a legally diminished expectation of priva-

---

**38.** *Id.* at 244.

**39.** *Id.* at 248 (quoting *Katz*, 389 U.S. at 351, 88 S.Ct. 507).

**1.** *Woods & Rohde, Inc. v. State, Dep't of Labor* 565 P.2d 138, 150 (Alaska 1977) (extending search and seizure protection to commercial property); *see also Reeves v. State*, 599 P.2d 727

(Alaska 1979) (expanding limits on preincarceration searches); *Jackson v. State*, 791 P.2d 1023 (Alaska App.1990) (limiting pat-down searches and rejecting the bright-line rule adopted by the U.S. Supreme Court in *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973)).

cy. Because I cannot agree with the court's departure from established Alaska and federal law, I respectfully dissent.

## I. *THE ALASKA CONSTITUTION PROTECTS INDIVIDUALS FROM SURREPTITIOUS POLICE VIDEO SURVEILLANCE.*

The "primary purpose" of Alaska's constitutional guarantee against unreasonable searches and seizures [2] is "the protection of personal privacy and dignity against unwarranted intrusion by the State." [3] Because of this protection, law enforcement officials may not intrude upon individual privacy without a warrant. The warrant requirement is a weighty one. As Chief Justice Jay Rabinowitz wrote in *Smith v. State*,[4] "[i]n my judgment, it is preferable to entrust the decision to invade citizens' privacy to the scrutiny of neutral judicial officials rather than police officers—even police officers operating under great self-restraint." Quoting the U.S. Supreme Court's opinion in *McDonald v. United States*,[5] Chief Justice Rabinowitz continued:

> We are not dealing with formalities. The presence of a search warrant serves a high function. Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police. This was done not to shield criminals nor to make the home a safe haven for illegal activities. It was done so that an objective mind might weigh the need to invade that privacy in order to enforce the law. The right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals.[6]

In *State v. Glass*, we held that warrantless electronic audio monitoring violated the state constitution.[7] In so holding, we expressed grave concerns about electronic surveillance technologies and their effect on "the right of persons to determine for themselves when, how, and to what extent information about them is communicated to others." [8] The court's decision today is at odds with both the logic and language of *Glass*. The *Glass* opinion emphasized "the high value placed on speech by our society," [9] but it did not thereby abandon our constitutionally mandated

**2.** *See* Alaska Const. art. 1, § 14.

**3.** *Woods & Rohde*, 565 P.2d at 148 (internal quotations omitted).

**4.** 510 P.2d 793, 800 (Alaska 1973).

**5.** 335 U.S. 451,. 69 S.Ct. 191, 93 L.Ed. 153 (1948).

**6.** *Smith v. State*, 510 P.2d 793, 800 (Alaska 1973) (Rabinowitz, J., dissenting) (quoting *McDonald*, 335 U.S. at 455–56, 69 S.Ct. 191); *see also Woods & Rohde*, 565 P.2d at 149 ("The conclusion that the imposition is reasonable should not be drawn by the very persons who are the agency for the deprivation of rights.") (quoting *Keller v. State*, 543 P.2d 1211, 1219 (Alaska 1975)).

**7.** 583 P.2d 872 (Alaska 1978). In *Glass*, we cited with approval a Montana case holding that, under Montana's state constitutional privacy provision, defendants reasonably expected privacy from audio broadcast of their conversation, despite the fact that they were in a public parking lot. *Id.* at 878 (*citing State v. Brackman*, 178 Mont. 105, 582 P.2d 1216 (1978)), *overruled by State v. Brown*, 232 Mont. 1, 755 P.2d 1364 (1988). More recent Montana cases have found broad protection from warrantless technologically aided surveillance under the state constitution. In *State v. Solis*, 214 Mont. 310, 693 P.2d 518 (1984), the Montana Supreme Court excluded from evidence videotapes of defendant's conversation with an undercover officer, and in *State v. Siegal* it found that warrantless thermo-imaging of an indoor marijuana-growing operation constituted an unreasonable search. 281 Mont. 250, 934 P.2d 176 (1997), *overruled on other grounds by State v. Kuneff*, 291 Mont. 474, 970 P.2d 556 (1998).

**8.** *Glass*, 583 P.2d at 880 (quoting Alan F. Westin, *Privacy and Freedom* 7 (1967)).

**9.** *State v. Page*, 932 P.2d 1297, 1297 (Alaska 1997) (Matthews, J., dissenting) (arguing that a concern for free speech was the central rationale in *Glass*). Video surveillance, too, threatens activities protected by the First Amendment, including assembly, writing, and symbolic speech. *See* U.S. Const. amend. I (protecting freedom of speech, freedom of the press, and the right to peaceable assembly); *see also Tinker v. Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503, 505–06, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (First Amendment protects right to wear black armbands to school to protest Vietnam conflict); *Johnson v. Tait*, 774 P.2d 185, 186 n. 3 (Alaska 1989) (Hell's Angels emblem is protected symbolic speech). The concern for freedom of expression in *Glass* is therefore applicable to this case, as well.

concern for "the protection of personal privacy and dignity against unwarranted intrusion by the State."[10] In fact, the *Glass* opinion built on this very concern: It spoke of "[t]he corrosive impact of warrantless ... monitoring on our sense of security"[11] and twice defined the right at issue in the case as the "right to be let alone."[12]

Our opinion in *Glass* even intimated that *Glass*'s specific holding should apply to video as well as audio surveillance. We suggested that Alaska's constitutional privacy provision may have been enacted "out of a concern to protect against extensive governmental use of electronic surveillance techniques."[13] We also mentioned with approval *Dietemann v. Time, Inc.*, a common-law privacy case involving both surreptitious photography and audio recording;[14] the analysis in that case almost exclusively concerned visual images and "electronic devices with their capacity to ... intrude upon [an individual's] most intimate activities, and expose his most personal characteristics to the public gaze."[15]

Warrantless secret electronic surveillance by law enforcement agents violates deeply held and constitutionally protected values. As we recognized in *Glass*, "we exclude the evidence [gathered by unconstitutional means] because the transcendent values preserved by constitutional guarantee are of greater societal moment than the use of that evidence to obtain a conviction."[16] These values remain paramount regardless of the facts of the case or the character of the defendant. As Justice Frankfurter explained, "[i]t is a fair summary of history to say that the safeguards of liberty have frequently been forged in controversies involving not very nice people. And so, while we are concerned here with a shabby defrauder, we must deal with his case in the context of what are really the great themes expressed by the Fourth Amendment."[17] Following those "great themes," our own precedent, and that of the U.S. Supreme Court, the government violated Lindalee Cowles's rights by subjecting her to surreptitious and warrantless video surveillance in the workplace.

## II. THE PRESENCE OF COWORKERS IN COWLES'S WORKPLACE CLEARLY DOES NOT DEFEAT HER REASONABLE EXPECTATION OF PRIVACY.

State and federal search and seizure provisions protect people, not places.[18] We have recognized that "[w]herever a man may be, he is entitled to know that he will remain free from unreasonable searches and seizures."[19] This right does not depend on an

10. *Woods & Rohde, Inc. v. State, Dep't of Labor* 565 P.2d 138, 148 (Alaska 1977) (extending search and seizure protection to commercial property) (internal quotations omitted).

11. 583 P.2d at 877 (quoting *Holmes v. Burr*, 486 F.2d 55, 65 (9th Cir.1973) (Hufstedler, J., dissenting)).

12. *Id.* at 876, 880.

13. *Id.* at 879 (*quoting State v. Roy*, 54 Haw. 513, 510 P.2d 1066, 1069 (1973)).

14. *Id.* at 880–81.

15. 449 F.2d 245, 248 (9th Cir.1971) (quoting *Briscoe v. Reader's Digest Ass'n*, 4 Cal.3d 529, 93 Cal.Rptr. 866, 483 P.2d 34, 37 (1971)). *See also United States v. Torres*, 751 F.2d 875 (7th Cir. 1984). In that case, Judge Posner observed:

[S]ecretly televising people (or taking still or moving pictures of them) while they are in what they think is a private place is an even greater intrusion on privacy than secretly recording their conversations.

*Id.* at 878.

16. *Glass*, 583 P.2d at 878 (explaining why "more reliable" evidence of a conversation is not necessarily admissible for that reason alone).

17. *United States v. Rabinowitz*, 339 U.S. 56, 69, 70 S.Ct. 430, 94 L.Ed. 653 (1950) (Frankfurter, J., dissenting), *overruled by Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), *quoted in McCoy v. State*, 491 P.2d 127, 139 (Alaska 1971) (Rabinowitz, J., concurring in part and dissenting in part).

18. *See Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

19. *State v. Glass*, 583 P.2d 872, 875 (Alaska 1978) (quoting *Katz*, 389 U.S. at 359, 88 S.Ct. 507). *Glass* implies that protection from search and seizure in general, and electronic surveillance in particular, extends to people in purely public locations. In holding the in-house audio surveillance in that case unconstitutional, we cited with approval a Montana case holding that, under Montana's state constitutional privacy provision, defendants reasonably expected privacy from audio broadcast of their conversation, de-

individual's physical location or on her status in the workplace. The court, however, concludes that constitutional protection depends on whether an individual shares her work space, holding that "the public nature of Cowles' office [is] the critical factor" in denying her Fourth Amendment protection.[20] This holding runs afoul of clear U.S. Supreme Court precedent and insupportably discriminates between citizens based on their workplace status.

The court suggests that the U.S. Supreme Court's decision in *Katz v. United States*[21] limits search and seizure protection to private locations.[22] But *Katz* created no such limitation-to the contrary it stated:

> What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. But what he seeks to preserve as private, *even in an area accessible to the public,* may be constitutionally protected.[23]

The *Katz* standard does not support this court's holding. Rather, it supports a conclusion that, regardless of her location, an individual who seeks and reasonably expects privacy is protected by the Fourth Amendment.

As subsequent cases applying *Katz* make clear, an individual such as Cowles can reasonably expect privacy in her workplace.

The U.S. Supreme Court applied the *Katz* standard to the workplace in *O'Connor v. Ortega*.[24] A majority of that Court found that a defendant can reasonably expect privacy in her office, even if that office is open to other people.[25] In today's decision, this court quotes *O'Connor*'s plurality opinion as legal authority.[26] But the quoted language[27] is not *O'Connor*'s holding; in fact, it conflicts with the only holding for which *O'Connor* legally stands: the narrow rule endorsed by Justice Antonin Scalia as the concurring fifth vote.[28] Justice Scalia's concurrence expressly disputed the plurality standard quoted by this court's majority. He wrote that the standard "must be wrong if it leads to the conclusion on the present facts that if Hospital officials had extensive work-related reasons to enter Dr. Ortega's office no Fourth Amendment protection existed. It is privacy that is protected by the Fourth Amendment, not solitude."[29] To illustrate the reach of the Fourth Amendment, Justice Scalia described a hypothetical defendant very much like Lindalee Cowles: "[T]he sec-

---

spite the fact that they were in a public parking lot. *See id.* at 878 (citing *State v. Brackman,* 178 Mont. 105, 582 P.2d 1216 (1978)). *See also State v. Bonnell,* 75 Haw. 124, 856 P.2d 1265, 1275 (1993) ("a person has a 'halo' of privacy wherever he goes and can invoke a protectable right to privacy wherever he may legitimately be and reasonably expect freedom from governmental intrusion").

20. Op. at 1171.

21. 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

22. *See* Op. at 1171–1172.

23. *Id.* at 351, 88 S.Ct. 507 (emphasis added) (citations omitted).

24. 480 U.S. 709, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987).

25. *See id.* In *Mancusi v. DeForte,* 392 U.S. 364, 368–69, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968), the court established that a defendant who shared a single large office with several coworkers had a reasonable expectation of privacy that was defeated by a police search of the office.

26. *See* Op. at 1171.

27. "[S]ome government offices may be so open to fellow employees or the public that no expectation of privacy is reasonable." *O'Connor,* 480 U.S. at 718, 107 S.Ct. 1492 (plurality opinion).

28. "When a fragmented court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the court may be viewed as that position taken by those Members who concurred in the judgment on the narrowest grounds.'" *Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) (quoting *Gregg v. Georgia,* 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)). *See also Feliciano v. City of Cleveland,* 661 F.Supp. 578, 587 (N.D.Ohio 1987) (noting that only those aspects of *O'Connor* in which Scalia joined the plurality have "the weight of a decision of the Court"), *abrogated on other grounds by National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 671, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989).

29. *O'Connor,* 480 U.S. at 730, 107 S.Ct. 1492 (Scalia, J., concurring in judgment) (internal quotations and citations omitted).

retary working ... in an office frequently entered by ... other employees is protected against unreasonable searches of that office by the government."[30] Justice Scalia supported his position by reference to *Mancusi v. DeForte*, a case holding that the Fourth Amendment protected a defendant in an office shared with coworkers.[31] Justice Scalia's narrow rule—the rule for which *O'Connor* stands—is that government employees lose Fourth Amendment protection only in "such unusual situations as that in which the office is subject to *unrestricted public access.*"[32] Following this U.S. Supreme Court interpretation of the Federal Constitution, the presence of Cowles's coworkers did not defeat her privacy expectation.[33]

The legally binding rule from *O'Connor*, then, is that government workers enjoy a reasonable expectation of privacy in the office regardless of the presence of coworkers; their expectation remains reasonable unless the public has unrestricted access to the office.[34] The public clearly did not have unrestricted access to Cowles's office. Her office was an enclosed space, and public access was restricted by a door with a combination lock. The record does not suggest that members of the public ever physically entered the space; rather, public access was

limited to a view from the box-office window.[35] Under both *Katz* and *O'Connor*, Cowles's privacy at her desk is protected by the Fourth Amendment.[36]

This court's conclusion that only inhabitants of private offices are protected from warrantless surveillance is particularly disturbing because it effectively ties a defendant's constitutional rights to her economic status. Following the standard articulated today, executives in private offices will be protected, but clerical workers in shared work spaces will not. This rule will disproportionately affect women, who represent 99% of secretaries, 96% of receptionists, 91% of bookkeepers, and 77% of cashiers.[37] The impact of this rule is still greater for African–American women, who are more likely to work in administrative support or service positions than in any other jobs.[38] The court offers no principled reason why constitutional protection of privacy, which we have defined as "the individual's interest in preserving his essential dignity as a human being,"[39] should depend upon an individual's status in the workplace.

Chief Justice Rabinowitz raised a nearly identical objection in his dissent from *Smith v. State*.[40] The court held that individuals

30. *Id.*

31. 392 U.S. at 368–69, 88 S.Ct. 2120.

32. 480 U.S. at 731, 107 S.Ct. 1492 (emphasis added).

33. The leading treatise on Fourth Amendment law reinforces this analysis, pointing out that "[i]t is very important to recognize that a majority of the [U.S. Supreme Court] subscribes to a somewhat broader notion of a public employee's justified privacy expectations in the workplace [than that expressed by the plurality]." 4 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 10.3(d), at 482 (3d ed.1996).

34. *See O'Connor*, 480 U.S. at 718, 107 S.Ct. 1492.

35. As discussed below, the partial visibility of Cowles's desk from the public area outside the box office does not defeat her reasonable expectation of privacy from the type of surveillance employed in this case.

36. The court cites without discussion *Vega–Rodriguez v. Puerto Rico Telephone Co.*, 110 F.3d 174

(1st Cir.1997). Op. at 1172 n. 14. Interestingly, the *Vega–Rodriguez* holding depended on the fact that the surveillance was *disclosed*—"the affected workers were on clear notice from the outset" of the video surveillance. *Id.* at 180. The court "caution[ed], however, that cases involving the covert use of clandestine cameras, or cases involving electronically—assisted eavesdropping, may be quite another story." *Id.* at 180 n. 5.

37. Women's Bureau, U.S. Dep't of Labor, Twenty Leading Occupations of Employed Women (1999) (March 14, 2001) <http://www.dol.gov/dol/wb/public/wb—pubs/20lead99.htm>.

38. Women's Bureau, U.S. Dep't of Labor, No. 97–1, Facts on Working Women, Black Women in the Labor Force (1997).

39. *Glass*, 583 P.2d at 880 (quoting Alan F. Westin, *Privacy and Freedom* 7 (1967)).

40. 510 P.2d 793 (Alaska 1973). The New Jersey Supreme Court cited Chief Justice Rabinowitz's dissent in its holding that curbside trash searches violate the New Jersey Constitution. *See State v. Hempele*, 120 N.J. 182, 576 A.2d 793, 805 (1990).

who disposed of trash in a common dumpster could not reasonably expect that the police would not search their garbage.[41] But Chief Justice Rabinowitz disagreed with the majority's holding "insofar as it discriminates between the right to privacy of citizens occupying a single family dwelling, and those living in multiple unit dwelling places."[42] He explained:

> In my opinion, such a distinction is unjustifiable as being either arbitrary or ultimately grounded upon impermissible economic discrimination.... Nowhere in the text of the fourth amendment, article I, section 14 or article I, section 22 is the proviso, "for property owners only." ... To make the protection of the fourth amendment, article I, section 14 or article I, section 22 depend upon the economic status of an individual ... is, in my opinion, unacceptable. The appropriate analytical focal point should be appellant's reasonable expectation of privacy. In my view, such expectation will remain constant, regardless of whether appellant's living unit is situated by itself on a spacious multi-acre estate or stacked upon others in a ... crowded tenement in the inner city.[43]

The individual's reasonable expectation of privacy from police video surveillance should similarly remain constant whether she works in a private office or a crowded common space. "It is privacy that is protected by the Fourth Amendment [and article I, sections 14 and 22 of the Alaska Constitution], not solitude."[44] The court gravely errs by recognizing constitutional protection for ex-

ecutives in private offices but denying it to secretaries in typing pools.

III. *THE PARTIAL VISIBILITY OF COWLES'S WORKPLACE THROUGH A BOX OFFICE WINDOW CLEARLY DOES NOT DEFEAT HER REASONABLE EXPECTATION OF PRIVACY FROM OVERHEAD VIDEO SURVEILLANCE.*

Cowles's desk was partially visible to the public through a customer service window.[45] Based on this fact, the court concludes that Cowles had no reasonable expectation of privacy from ceiling-mounted video surveillance by the police. This conclusion is at odds with our own precedent and with that of other state and federal courts. Because video surveillance is particularly intrusive, and because it far exceeds the reasonable expectations of people in all but the most public locations, numerous courts agree that warrantless police surveillance violates defendants' rights.

A. *Police May Not, Without a Warrant, Use Means of Surveillance More Intrusive than Those Which a Defendant Reasonably Expects from Public Observers.*

Even in an area completely open to the public—which Cowles's office was not—citizens are protected from intrusive, warrantless searches. Again, the standard is the defendant's reasonable expectation of priva-

41. See *Smith*, 510 P.2d at 798.

42. 510 P.2d at 805 (Rabinowitz, C.J., dissenting).

43. *Id.*

44. *O'Connor*, 480 U.S. at 730, 107 S.Ct. 1492 (Scalia, J., concurring).

45. The court below found that Cowles's incriminating activities were visible to the public. *Cowles v. State*, 961 P.2d 438, 443 (Alaska App. 1998). But the record indicates that the detail captured by the camera surpassed that which any member of the public could have seen. This intrusive focus is relevant to Fourth Amendment analysis even if the public's less-intrusive gaze

would also have discerned the incriminating acts. See *United States v. Taketa*, 923 F.2d 665, 677 (9th Cir.1991) (treating intrusiveness against personal dignity as reason for finding search unreasonable in video surveillance case); *State v. Bonnell*, 75 Haw. 124, 856 P.2d 1265, 1277 (1993) (same).

A police witness testified that Cowles's desk was 12–13 feet from the window and her desktop was partially obscured from view. He indicated that a member of the public could not see everything recorded by the camera without simultaneously looking through both the box office window and the door around the corner from the window. The record does not reflect whether the door and window were open when the surveillance was conducted, although they were typically open during business hours.

cy.[46] Where the defendant should reasonably expect public observation, the government may engage in observation of that sort. But the presence of public observers does not give the government unlimited license to pursue more intrusive modes of surveillance. The U.S. Supreme Court has repeatedly articulated this standard. Thus, in *Katz*, a defendant inside a glass phone booth could reasonably expect to be seen, but not heard.[47] Similarly, a merchant who invites the public to view his goods is constitutionally protected from police using more intrusive techniques for "seeing them as a customer would [not] ordinarily see them."[48] In its most recent term, the Court reaffirmed this principle, holding that a bus passenger who knew that other passengers or bus employees might handle his soft-sided luggage nevertheless reasonably expected privacy from a law enforcement agent "feel[ing] the bag in an exploratory manner."[49] These rulings reflect a single consistent rule: citizens may reasonably expect privacy from intrusive modes of government observation, even if they expect members of the public to engage in less intrusive observation.

B. *Secret Overhead Video Surveillance Is a More Intrusive Mode of Observation than Cowles Could Reasonably Have Expected from the Public or Her Coworkers.*

Courts have recognized two related but distinct ways in which secret video surveillance uniquely intrudes on privacy. First, police monitoring by hidden cameras poses a special threat to personal dignity, security, and privacy. Second, hidden cameras may violate reasonable expectations of privacy as a practical matter, because an individual does not reasonably expect sustained observation from a vantage point where no human would reasonably be. Courts have drawn on both conceptions of defendants' reasonable expectation of privacy to conclude that hidden video surveillance by police violates constitutional rights.

1. *Secret police video surveillance is uniquely offensive to individual dignity and privacy.*

Video surveillance is a far more intrusive mode of observation than Cowles could reasonably have expected from her coworkers or the public. Our own opinion in *Glass* recognized that warrantless electronic surveillance has a "corrosive impact ... on our sense of security."[50] In cases involving video surveillance, courts have found it "unarguable that television surveillance is exceedingly intrusive ... and inherently indiscriminate, and that it could be grossly abused—to eliminate personal privacy as understood in modern Western nations."[51] In the recent words of the Court of Appeals for the Ninth Circuit, "[h]idden video surveillance is one of the most intrusive investigative mechanisms available to law enforce-

**46.** *See City and Borough of Juneau v. Quinto*, 684 P.2d 127, 129 (Alaska 1984).

**47.** *See Katz v. United States*, 389 U.S. 347, 352, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

**48.** *Lo–Ji Sales, Inc. v. New York*, 442 U.S. 319, 329, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979) (where town justice issuing warrant did not pay for films he viewed and removed wrappers from print material, he "was not seeing them as a customer would ordinarily see them," and therefore violated the Fourth Amendment); *see also Maryland v. Macon*, 472 U.S. 463, 470, 105 S.Ct. 2778, 86 L.Ed.2d 370 (1985) (in vice investigations, "[a] government agent, in the same manner as a private person, may accept an invitation to do business and may enter upon the premises for the very purposes contemplated by the occupant") (quoting *Lewis v. United States*, 385 U.S. 206, 211, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966)).

**49.** *Bond v. United States*, 529 U.S. 334, 339, 120 S.Ct. 1462, 146 L.Ed.2d 365 (2000).

**50.** *Glass*, 583 P.2d at 877 (quoting *Holmes v. Burr*, 486 F.2d 55, 66 (9th Cir.1973) (Hufstedler, J., dissenting)).

**51.** *State v. Bonnell*, 75 Haw. 124, 856 P.2d 1265, 1277 (1993) (quoting *United States v. Torres*, 751 F.2d 875, 882 (7th Cir.1984); *see also United States v. Cuevas–Sanchez*, 821 F.2d 248, 252 (5th Cir.1987) (adopting constitutional standards governing valid warrants for video surveillance)); *State v. Thomas*, 642 N.E.2d 240, 245 (Ind.App. 1994) (Department of Natural Resources's right to inspect concessionaire's premises did not confer right to install hidden video surveillance).

ment."[52] The court quoted Judge Kozinski's statement that "every court considering the issue has noted [that] video surveillance can result in extraordinarily serious intrusions into personal privacy.... If such intrusions are ever permissible, they must be justified by an extraordinary showing of need."[53] Surreptitious video recording is clearly more intrusive than the ordinary public gaze which a defendant in Cowles's position might expect. As such, it is beyond the range of activities in which law enforcement agents may, without a warrant, engage.

### 2. Secret overhead video surveillance violates defendants' reasonable expectations of privacy because it gives police information that defendants do not reasonably expect to expose to public observers.

Surreptitious overhead video surveillance by police violated Cowles's reasonable expectation of privacy because it exceeded her reasonably expected public observation in its duration, proximity, focus, and vantage point. Cases involving aerial observation of defendants' property confirm that a defendant may expect the public gaze without reasonably expecting the unblinking lens of a video camera close overhead.

Two U.S. Supreme Court cases, *California v. Ciraolo*[54] and *Florida v. Riley*,[55] hold that defendants should reasonably expect overflight observation by law enforcement officers in airplanes or helicopters, *because it is routine for members of the public to see the same view* during air travel.[56] But it was not routine or even possible for members of the public to view Cowles's desk as did the police investigators through their video camera. The public did not have access to the box-office ceiling. The record suggests that members of the public looking in the window may not even have been able to see past piles of paper on the desk to observe all of the incriminating activities captured on tape, including desktop activities such as Cowles's writing on the cash deposit receipt.

Even if intermittent public observation from the ceiling vantage point were possible, case law applying *Ciraolo* indicates that warrantless overhead *video* surveillance would still violate the Fourth Amendment. In *United States v. Cuevas–Sanchez*, the Court of Appeals for the Fifth Circuit faced this question: "*Ciraolo* teaches us that a fly-over by a plane at 1,000 feet does not intrude upon the daily existence of most people; we must now determine whether a camera monitoring all of a person's backyard activity does ."[57] The court of appeals opined that *Ciraolo* does not "authorize[ ] any type of surveillance whatever just because one type of minimally-intrusive aerial observation is

---

**52.** *United States v. Nerber*, 222 F.3d 597, 603 (9th Cir.2000).

**53.** *Id.* (quoting *United States v. Koyomejian*, 970 F.2d 536, 551 (9th Cir.1992) (Kozinski, J., concurring) (alterations in original)). *See also* George Orwell's description of video surveillance from *1984:*

> The telescreen received and transmitted simultaneously. Any sound that Winston made, above the level of a very low whisper, would be picked up by it; moreover, so long as he remained within the field of vision which the metal plaque commanded, he could be seen as well as heard. There was of course no way of knowing whether you were being watched at any given moment.

George Orwell, *1984* 4 (1949) (quoted in *Cuevas–Sanchez*, 821 F.2d at 251 n. 3).

**54.** 476 U.S. 207, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986).

**55.** 488 U.S. 445, 109 S.Ct. 693, 102 L.Ed.2d 835 (1989).

**56.** *See id.* at 450–51, 109 S.Ct. 693 (plurality holding, four votes) and 452–55 (O'Connor, J., concurring); *Ciraolo*, 476 U.S. at 213–14, 106 S.Ct. 1809; *see also Katz*, 389 U.S. at 359, 88 S.Ct. 507 (a defendant loses Fourth Amendment protection only for activities he "knowingly exposes to the public.... But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.") (citation omitted). Thus, exposing an activity to the sky or ceiling overhead constitutes knowing exposure to the public only if the public can reasonably be expected to occupy that vantage point.

**57.** 821 F.2d 248, 251 (5th Cir.1987) (holding that video surveillance was a search for Fourth Amendment purposes, but that the warrant obtained by police was valid). In *Florida v. Riley*, the court approved closer observation from only 400 feet, but as in *Ciraolo*, the ruling depended on the fact that a member of the public could see the same view. *See Riley*, 488 U.S. at 449–50, 109 S.Ct. 693.

possible." [58] It concluded that government agents could not engage in warrantless video surveillance because this "potentially indiscriminate and most intrusive method of surveillance" was not comparable to the routine public observations discussed in *Ciraolo*.[59]

A California court, applying federal constitutional law, arrived at similar governing principles without specifically addressing video surveillance in *People v. Romo*.[60] The court indicated that, under *Ciraolo*, a defendant's reasonable expectation of privacy might be violated by law enforcement agents hovering over her property or using electronic aids to observation.[61] The reasonableness of overflight observation, the court stated, depends in part on the duration and altitude of the observation.[62] Following this standard, sustained observation from close overhead is more likely to violate the Fourth Amendment than would the passing observation of a law enforcement officer in an aircraft. In this case, the government observed Cowles from a non-public vantage point immediately over her head for a period of hours, and it used uniquely intrusive surveillance technology to do so. This action was a search; in the absence of a warrant, it was unconstitutional.

## IV. *PERSUASIVE FEDERAL AND STATE AUTHORITY HOLDS THAT WORKERS IN SEMI–PUBLIC WORKPLACES HAVE A REASONABLE EXPECTATION OF PRIVACY FROM SECRET GOVERNMENT VIDEO SURVEILLANCE.*

In both *State v. Thomas*[63] and *United States v. Taketa*,[64] courts concluded that war-

rantless video surveillance in the workplace violated workers' reasonable expectations of privacy, despite the fact that the workers did not have private offices. And in *State v. Bonnell*, the Hawaii Supreme Court explicitly relied on the "exceedingly intrusive" nature of video surveillance in concluding that a hidden camera in an employee breakroom violated workers' reasonable expectations of privacy.[65] The majority recognizes the significance of *Thomas* in its opinion, but misconstrues both *Taketa* and *Bonnell*. All three cases apply the clear legal principles outlined above to conclude that surveillance of the sort used in this case is unconstitutional.

In *Thomas*, state officials installed a video camera above the cash register of a park concession store and recorded the clerk's cash transactions.[66] The Indiana Court of Appeals applied both state and federal search and seizure law to conclude that the clerk reasonably expected privacy, and therefore the tape was inadmissible.[67] In so doing, it recognized all of the points of law discussed above: workers do not lose their expectation of privacy even in a publicly accessible workplace,[68] video is a uniquely intrusive mode of surveillance,[69] and prolonged observation from an overhead vantage point is "grossly intrusive."[70]

The Court of Appeals for the Ninth Circuit reached a similar conclusion in *Taketa*.[71] In that case, federal agents installed a hidden video camera in the ceiling of defendant Thomas O'Brien's office.[72] The camera re-

58. 821 F.2d at 251.

59. *Id.* at 250–51.

60. 198 Cal.App.3d 581, 243 Cal.Rptr. 801 (1988) (holding that overflight observation was not a search because the aircraft had a right to occupy its public vantage point, and the flight was neither unreasonable nor intrusive).

61. *See id.* at 805.

62. *See id.*

63. 642 N.E.2d 240 (Ind.App.1994).

64. 923 F.2d 665 (9th Cir.1991).

65. 75 Haw. 124, 856 P.2d 1265, 1277 (1993).

66. 642 N.E.2d at 242.

67. *See id.* at 247.

68. *See id.* at 244–45.

69. *See id.* at 245.

70. *Id.* at 245.

71. 923 F.2d 665 (9th Cir.1991).

72. *See id.* at 669.

corded incriminating footage of both O'Brien and a coworker, David Taketa. The *Taketa* court concluded that the surveillance violated the Fourth Amendment rights of both men.[73]

As the majority characterizes *Taketa*, the *Taketa* court found Taketa's expectation of privacy reasonable only "because of the private nature of the place where the videotaping took place and the time when it occurred."[74] But *Taketa* plainly does not support this reading; the *Taketa* court explicitly and repeatedly named as the primary bases for its decision two factors discussed at length in this dissent: the intrusive nature of video surveillance and the personal locus of privacy rights, even in non-private places. The *Taketa* court cited *Katz* for the principle that "the Fourth Amendment protects people not places";[75] then "base[d its] holding expressly upon *Katz*, and upon [the court's] recognition of the exceptional intrusiveness of video surveillance."[76] This court's majority apparently ignores this unambiguous language in its discussion of *Taketa*.[77]

In analyzing Taketa's right to freedom from secret video surveillance, the *Taketa* court emphasized that its decision was based on Taketa's personal privacy rights, and not merely on location-based privacy.[78] It noted that "persons may create temporary zones of privacy within which they may not reasonably be videotaped … even when that zone is a place they do not own or normally control, and in which they might not be able reasonably to challenge a search at some other time or by some other means."[79] This individually rooted right was violated, the

*Taketa* court held, both because the "silent, unblinking lens of the camera was intrusive" as no human search of the office could have been, and because the "video search was directed straight at [Taketa]."[80] These factors are identical in the case now before us.

Yet a third case excluding video evidence like that at issue today, *State v. Bonnell*, explicitly relied on the "exceedingly intrusive" nature of video surveillance and the defendants' personal, non-location-based privacy rights as bases for the ruling.[81] The Hawaii Supreme Court in *Bonnell* also relied on the non-public nature of the surveilled space—an employee breakroom—as an element of its decision.[82] But, like the Ninth Circuit in *Taketa*, it strongly emphasized personal privacy rights: "A person has a 'halo' of privacy wherever he goes and can invoke a protectable right to privacy wherever he may legitimately be."[83] And it discussed in no uncertain terms the suspicion with which the court viewed video surveillance, concluding that such surveillance is more intrusive than audio taping and that this intrusiveness was an essential factor for Fourth Amendment analysis.[84] The court explicitly grounded its decision in "the same factors as those considered by the *Taketa* court."[85] The court also implied that because of the individual privacy right at stake, the outcome of the case might have been the same even if the defendants were not in a private room. "Whatever the general privacy interest the defendants may or may not have had in the break room," the court wrote, "they had an actual and objectively reasonable expectation of privacy against be-

73. *See id.* at 678.

74. Op. at 1174.

75. *Id.* at 676 (quoting *Katz v. United States*, 389 U.S. 347, 350, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)).

76. *Id.* at 677.

77. Two cases which draw on *Taketa* support the discussion above and conflict with the majority's interpretation. *See United States v. Nerber*, 222 F.3d 597, 602 (9th Cir.2000); *State v. Bonnell*, 75 Haw. 124, 856 P.2d 1265, 1266–67 (1993).

78. 923 F.2d at 677.

79. *Id.* at 677.

80. *Id.* at 677.

81. 75 Haw. 124, 856 P.2d 1265, 1276–77 (1993).

82. *See id.* at 1275.

83. *Id.* (quotation omitted).

84. *See id.* at 1277.

85. *Id.*

ing taped in it." [86]

*Thomas, Taketa,* and *Bonnell* all squarely support Cowles's claim that police surveillance by hidden camera violated her rights against unreasonable search and seizure. All three cases apply the straightforward legal standards established by the U.S. Supreme Court. Because the court today offers scant authority for the opposite conclusion, I cannot agree with its holding.

## V. *NO AUTHORITY SUPPORTS THE COURT'S ASSERTION THAT COWLES'S RESPONSIBILITY FOR HANDLING CASH SHOULD HAVE DIMINISHED HER EXPECTATION OF PRIVACY.*

The court states that "the fact that Cowles was entrusted with handling her employer's cash is a relevant factor bearing on the reasonableness of Cowles's expectation of privacy." [87] While this factor may certainly be relevant to the legal analysis of surveillance conducted by employers, it is not relevant when surveillance is carried out by police. Although the majority offers two legal authorities for its position, neither supports the court's assertion that workplace responsibility for cash should increase an employee's expectation of police surveillance.

First, the court cites *National Treasury Employees Union v. Von Raab,* a case holding that drug testing of U.S. Customs Service employees is reasonable. [88] *Von Raab* states in dicta that operational realities of the workplace can render reasonable requirements that would elsewhere be unreasonable—such as physical fitness requirements in the military or daily personal searches for U.S. Mint workers. [89] But "these operational realities will rarely affect an employee's expectations of privacy." [90] *Von Raab* nowhere states or even implies the sweepingly broad rule that anyone who works with cash has a

diminished expectation of privacy; it certainly does not support today's specific ruling that police may surreptitiously, and without a warrant videotape anyone who handles an employer's cash.

Second, the court relies on a footnote from Professor LaFave's treatise, [91] discussing *United States v. Donato.* [92] In that case, however, a federal district court upheld the search of a federal mint employee's locker only because federal regulations permitted the search. [93] No case law or other authority supports the novel proposition that an employee's fiduciary duty should reduce her reasonable expectation of privacy from police surveillance at her desk; the court's adoption of this rule is unprecedented and groundless.

## VI. *CONCLUSION*

Under *Katz* and *O'Connor,* people who work in shared quarters or who work with the public still have Fourth Amendment rights. The court offers no precedent or principled argument for stripping Alaskans of these rights. Nor does the court address other rulings limiting the scope of police searches and surveillance, and specifically holding that warrantless secret videotaping of workers is unconstitutional. Today's holding dramatically restricts the rights of Alaskans who do not occupy their own offices: It establishes that secret video monitoring by the police should be among their reasonable expectations. I cannot support this conclusion and therefore respectfully dissent.

---

86. *Id.* (internal quotations omitted).

87. Op. at 1173.

88. 489 U.S. 656, 677, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989); *see* Op. at 1173 n. 23.

89. *See id.* at 671.

90. *Id.*

91. 3 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 8.6, at 823 n. 86 (3d ed.1996).

92. 269 F.Supp. 921 (E.D.Pa.1967).

93. *See id.* at 923–24.